## Phila., Appellant, *v.* Masonic Home of Pen'na.

*Taxation—Exemption—Masonic Home—Charity.*

A charity is a gift to promote the welfare of others.

A charity is not a " purely public charity " which excludes from its benefits any person because he has not a particular relation to some society, church or other organization.

It seems that so long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be benefited, it is public.

A home limited to indigent, afflicted and aged Freemasons, although supported by voluntary contributions, without charge to the beneficiaries, and with no profit either to the corporation or its officers, is not a " purely public charity," exempt from taxation within the meaning of the constitution, sec. 1, art. 9, and the act of May 14, 1874, P. L. 158.

*Tax exemptions—Statutes—Repeal—Act of May 14, 1874.*

The act of May 14, 1874, P. L. 158, in connection with the constitution of 1874, repeals all tax exemptions enacted after the constitutional amendment of 1857

Argued Jan. 19, 1893; reargued Jan. 2, 1894.    Appeal, No. 61, July T., 1892, by plaintiff, from judgment of C. P. No. 4, Phila. Co., Sept. T., 1889, No. 923, M. L. D., on verdict for defendant.    Before STERRETT, C. J., GREEN, WILLIAMS, MC-COLLUM, MITCHELL, DEAN and FELL, JJ.    Reversed.

Sci. fa. sur municipal claim for taxes.

At the trial, it appeared that the Masonic Home was incorporated under the act of May 6, 1871, P. L. 615.    On April 14, 1884, the Home of Free and Accepted Masons of Pennsylvania was incorporated by the Court of Common Pleas of Philadelphia county.    On Sept. 6, 1887, the two corporations were merged by a decree of court.    The act of May 6, 1871, P. L. 615, exempted the property of the Masonic Home from taxation.

Defendant's charter under act of May 6, 1871, P. L. 615, was as follows:

" SECTION 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted, by the authority of the same, that Robert A. Lamberton, Christian F. Knapp, Henry B. McKean, Michael Nisbet, John A. Wright, D. W. C. Carroll, Jeremiah L. Hutchinson, Samuel B. Dick, James M. Porter and James H. Hopkins, their associates and successors, be and they are hereby created a body corporate and politic, with perpetual succession, by the name and style of ' The Masonic Home of Pennsylvania,' and by that name are made capable in law and equity to sue and be sued, plead and be impleaded, contract and be contracted with, and to make, have and use a common seal and the same to break, alter, renew at pleasure, ordain by-laws, and shall have the right to take and hold by purchase, gift or devise, real and personal estate, free from all taxation, for the purposes hereinafter named, and to sell, convey or exchange the same at pleasure.

" SEC. 2. The object of said institution shall be to provide and sustain in the state of Pennsylvania one or more houses for destitute widows and orphans of deceased Freemasons of the state of Pennsylvania, and an infirmary or infirmaries for the reception and care of sick and afflicted Freemasons in indigent circumstances, and all such as may be placed under its charge by its managers.

" SEC. 3. The membership of said institution shall consist of life members, active members and representatives of masonic bodies, under such regulations as the committee of management may prescribe—all of whom shall be Freemasons.

" SEC. 4. There shall be a meeting of the members of the institution called within three months after the passage of this act, for the purpose of electing members of the committee of management, prescribing its constitution and general rules and regulations for the government of the institution." . . .

The by-laws applicable to the question at issue were as follows:

" OBJECT OF THE HOME.

" SECTION 1. The Masonic Home shall have for its object, to provide and maintain a home for indigent, afflicted or aged

Freemasons, and for the destitute widows and orphans of Free-
masons in the state of Pennsylvania, and for such others as
may be placed under its charge.

## "CORPORATION.

"SEC. 2. This corporation shall be composed of individuals
as representatives of such masonic bodies as are recognized by
the Grand Lodge of Free and Accepted Masons of Pennsyl-
vania, and of such Master Masons as may become members
thereof by complying with the by-laws.

## "ADMISSION OF INMATES AND FEES.

"SEC. 41. Every nomination for admission into the home as
an inmate shall be made in writing, at a stated meeting of the
board of managers, setting forth the name, age (not less than
fifty-five years), residence, social condition, and masonic mem-
bership of the nominee, with such other information as the
board of managers may require.

"All nominations shall be recorded in a book kept for that
purpose, in the order in which they are presented, and shall
be referred by the board of managers to the committee on ad-
missions.

"SEC. 42. Inmates shall be admitted into the home after re-
port of the committee on admissions; those under sixty years
of age requiring a two thirds, and others a majority, vote of
the board of managers.

"SEC. 43. Each representative shall be entitled to make as
many nominations for admission into the home as inmates as
he may deem advisable, at the request of the masonic body
represented by him; but not more than one nominee of a rep-
resentative shall be admitted as an inmate while other nomi-
nees are upon the list from bodies which have at the time no
inmate, and whose admission is approved by the board of
managers.

"Individual members may also make nominations, subject
to the same restrictions as to inmates as hereinbefore stated.

"In the event of an inmate withdrawing from the home, for
any cause whatever, within three months after admission, so
much of the fee paid into the funds of this corporation as shall
remain after deducting five dollars ($5.00) per week for his

board during his residence in the home, and, in addition, such other expenses as may be incurred in his behalf, shall be returned to the masonic body or individual member that paid the same.

" The preference for admission shall always be given in the following order, viz. :

" 1. To such nominees as are members of masonic bodies represented in the corporation, and nominated at their instance.

" 2. To such nominees as may be placed in nomination by a representative of one masonic body, where the nominee is a member of some other masonic body which is also represented.

" 3. To Master Masons nominated by individual members.

" 4. To Master Masons belonging to masonic bodies located within the commonwealth of Pennsylvania, but not represented in this corporation, who may have been nominated as aforesaid.

" 5. To Master Masons of other jurisdictions upon such nomination.

" SEC. 44. There shall be paid into the funds of this corporation, as the admission fee of an inmate, the sum hereinafter named, according to the age of the brother so admitted, as follows :

" If the applicant be 55 years of age, and not
    exceeding 60 years, .   .   .   .   .    $250 00
If the applicant be 60 years of age, and not
    exceeding 65 years,   .   .   .   .    200 00
If the applicant be 65 years of age, and not
    exceeding 70 years,   .   .   .   .    150 00
If the applicant be over 70 years of age, .    100 00

" SEC. 45.. Any Master Mason wishing to secure a home for himself in his declining years shall, upon becoming a member of this corporation and the payment of four hundred ($400.00) dollars in addition to his membership fee, be at once nominated by a majority vote of the board of managers for admission into the home, in accordance with section 41 of these by-laws. He shall be exempt from the payment of annual dues, and, upon reaching the age of sixty (60) years or upwards, shall have precedence, according to date of nomination, of all other Master Masons nominated by either representatives or by individual members, subject, however, to the restrictions of section 43 of these by-laws ; Provided, That any member of this corporation,

becoming an inmate of the home, shall thereby forfeit and terminate his membership in the corporation.

## "PERMANENT FUND.

"SEC. 46. The permanent fund shall consist of the fees for life membership and admission of inmates, and of all donations and bequests, when not otherwise designated by the donor or legatee, and such other amounts as may be voted to the fund by the board of managers.

"All investments in the permanent fund shall be made under the supervision and direction of the committee on finance, who shall make a report of the investments in the fund annually, or whenever required, to the board of managers and the corporation.

"The interest from such investments shall be paid to the treasurer for the general uses of the corporation."

It was admitted that defendant institute was supported as a charity.

Binding instructions for defendant were given.

Verdict and judgment for defendant. Plaintiff appealed.

*Error assigned* was above instruction, quoting it.

*James Alcorn*, assistant city solicitor, *Isaac H. Shields*, assistant city solicitor, and *Charles F. Warwick*, city solicitor, with him, for appellant.—The exemption clause of the act of May 6, 1871, was repealed by the act of 1874: Wagner Free Institute v. Phila., 132 Pa. 612; Phila. v. Penna. Hospital, 134 Pa. 171; Allegheny Co. v. Gibson, 90 Pa. 397; Perkins v. Slack, 86 Pa. 270; Lehigh Iron Co. v. Lower Macungie Township, 81 Pa. 484.

The constitution of 1874 does not exempt any property from taxation, but authorizes the legislature by general laws to exempt the property mentioned in § 1, art. 9. It thereby limited the power of the legislature. In pursuance of that authority, the act of May 14, 1874, P. L. 158, was passed. There is now no exemption except as mentioned in § 1, art. 9, as enforced by the act of May 14, 1874. Unless appellee is within the class referred to in said section and act, it is not exempt from taxation.

Appellee is not a purely public charity, and therefore exempt

from taxation by § 1, art. 9, of the constitution, and the act of May 14, 1874, P. L. 158: Donohugh's Ap., 86 Pa. 306 ; Burd Orphan Asylum v. School District, 90 Pa. 21 ; Delaware County Inst. v. Delaware Co., 94 Pa. 163 ; Phila. v. Women's Christian Assn., 125 Pa. 572 ; Northampton Co. v. Lafayette College, 128 Pa. 132 ; Episcopal Academy v. Phila., 150 Pa. 565.

*Robert H. Hinckley,* for appellee.—By the terms of the act of May 6, 1871, defendant's property was to be held by it free from all taxation, and it is contended that this act is still in force.    The act of May 14, 1874, P. L. 158, does not, by any of its terms, repeal this previous statute of 1871: Bell v. Allegheny Co., 149 Pa. 381 ; Williamsport v. Brown, 84 Pa. 438 ; Coatesville Gas Co. v. Chester Co., 97 Pa. 476 ; Erie Co. v. Erie, 113 Pa. 367 ; Allegheny County v. Gibson, 90 Pa. 411 ; Evans v. Phillipi, 117 Pa. 237.

In Phila. v. Penna. Hospital, 134 Pa. 171, the power of the constitutional provisions to repeal exceptions was not before the court.    There the decision was limited to subsequent legislation.

The home is a public charity: Burd Orphan Asylum v. School District, 90 Pa. 21 ; Phila. v. Women's Christian Association, 125 Pa. 572.

OPINION BY MR. JUSTICE DEAN, April 2, 1894:

There is nothing of doubt in this case, except the question as to whether the appellee is an "institution of purely public charity," within the meaning of section 10, article 16, of the constitution of 1874. If it be not, nothing in its charter or the statutes can avail to exempt it from liability to taxation.

The contention turns on the constitutional meaning of the words "purely public charity." "Words in a constitution that do not of themselves denote that they are used in a technical sense, are to have their plain, proper, natural and obvious meaning:" Nav. Co. v. Coons, 6 W. & S. 114. The legal definition of the word "charity" has been the subject of much discussion in the courts, especially in those of England, but its meaning here, discarding all technical sense, is, "a gift to promote the welfare of others." The appellee clearly is a charity. It provides for and maintains in the "Masonic Home" indigent,

afflicted and aged Freemasons. This too from voluntary contributions, without charge to the beneficiaries, and with no profit either to the corporation, or to its officers. Not one of the corporate officers receives a cent of compensation for administering its affairs; such unselfishness excites the admiration and approval of all friends of humanity. General Wagner, president of the home, testifies: " The number of inmates at present is thirty; their average age is 72 years; all are decrepit; if they could support themselves, they would not be admitted; the money to support them is contributed by different masonic lodges, individuals, Masons, men and women; the receipts are always less than the expenses, and a deficit has to be made up at the end of each year; no one is benefited except the inmates; they are fed, clothed, and lodged during life, and buried at death at the expense of the home." Of course, if this be not purely charity, nothing is.

But, is it a public charity? The word "public" relates to or affects the whole people of a nation or state. General Wagner further testifies: " The home is open only to those who are Masons; a man to be admitted must be a Mason." When the eligibility of those admitted is thus determined, it seems to us the institution is withdrawn from public and put in the class of private charities.

A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases; for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be directly benefited, it is public. But when the right to admission depends on the fact of voluntary association with some particular society then a distinction is made which concerns not the public at large. The public is interested in the relief of its members, because they are men, women and children, not because they are Masons. A home without charge, exclusively for Presbyterians, Episcopalians, Catholics or Methodists, would not be a public charity. But then to exclude every other idea of public, as distinguished from private, the word "purely" is prefixed by the constitution; this is to in-

tensify the word "public," not "charity." It must be purely public; that is, there must be no admixture of any qualification for admission, heterogeneous, and not solely relating to the public. That the appellee is wholly without profit or gain only shows that it is purely a charity, and not that it is a purely public charity.

Nor does the argument that, to the extent it benefits Masons, it necessarily relieves the public burden, affect the question; there is no public burden for the relief of aged and indigent Masons; there is the public burden of caring for and relieving aged and indigent men, whether they be Masons or anti-Masons; but age and indigence concern the public no further than the fact of them; it makes no inquiry into the social relations of the subjects of them. Burd Orphan Asylum v. School District, 90 Pa. 21, is cited as sustaining a different view. The test there, as to whether the defendant was a purely public charity, was, whether there was any gain or profit to any class of persons or corporations who could assert a right to be beneficiaries. As there was not, and as the administrators of the charity could, in their discretion, select those who should be the recipients of the benefits, giving only a preference, the court held it to be a purely public charity. While concurring in the judgment in that case, because the facts showed it was administered as a purely public charity, I do not concur in the reason given for distinguishing a quasi-public from a purely public charity. I would put the distinction on firmer as well as on what seems to me more clearly defined ground: Is any member of humanity, that greater public of whom the commonwealth is constructively the parent or trustee, excluded because he has not a particular relation to some society, church or other organization, which relation is dependent on his wholly voluntary act? If so, if he be excluded in fact, because he is not a Presbyterian, Freemason, or a member of some one of the innumerable religious, social, or beneficial organizations of the commonwealth, then, however pure may be the charity, however commendable its purpose, it is not "purely public," and its property must, under the constitution, be taxed; not because this court says so, but because the people have said so in their fundamental law.

Here, while the charter and by-laws of the institution do not

show that it is not "purely public," the undisputed facts, as to the administration of the charity, show that none were admitted except Freemasons, of course excluding all other aged and indigent men, because they had not chosen to become members of a particular society. This made admission depend on an artificial badge of distinction, and not on one incident to humanity, and therefore it is not "purely public." If this be purely public, then what is not purely public?

This is not a question to be decided on sentiment; if it were, our inclinations would prompt to a different conclusion. But there is not much sentiment in the constitution. It is a barrier erected by the whole people against encroachments on the rights of the people as a whole; they have forbidden an annual appropriation of their money in a sum equal to the amount of taxes here imposed, for the benefit of a favored few; the duty of a court, when called upon to decide such a question, is so plain that he who runs may read.

As to the argument that the act of 1871 exempted the home from taxation, the act of 1874, when read in connection with the constitution of 1874, repealed all such exemptions enacted after the constitutional amendment of 1857. It is so decided in Wagner Institute v. Philadelphia, 132 Pa. 612, and Philadelphia v. Penna. Hospital, 134 Pa. 171.

The judgment is reversed at costs of appellee, and a new trial is awarded.


DISSENTING OPINION BY MR. JUSTICE WILLIAMS:

This appeal depends on a definition. Its decision will affect many of the noblest charities in the state. The words requiring definition are the words " purely public," as used in section 1 of article 9 of the constitution of Pennsylvania. The paragraph in which the words occur is as follows : " But the general assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, and institutions of purely public charity." A majority of this court holds that the defendant, The Masonic Home, is not an institution of purely public charity, and for that reason is subject to taxation like all other property held by private persons or organizations for private purposes. The

correctness of this decision depends on the result of two preliminary inquiries. First, what is the meaning of the words "purely public" as used in the constitution? Second, what is the character of The Masonic Home and its work? In reply to the first of these questions it should be noticed that the legislature has undertaken an interpretation of the constitutional provision and of these particular words, by a law passed at the same session at which the adoption of the constitution was formally declared. The law was passed for the express purpose of giving effect to the constitutional provision authorizing the exemption of certain property from taxation, and to guide the taxing officers of the state in determining what property was entitled to the exemption authorized by the constitution. This purpose made it necessary to consider and determine the exact extent of the limits within which the exercise of legislative power was permissible under section 1 of article 9; and to define accurately each class of property to which the privilege of exemption was extended by it. Our present concern is with the fourth class, viz.: "Institutions of purely public charity." The act of 1874 interpreted these words, and enumerated the institutions embraced by them, so as to include "All hospitals, universities, colleges, seminaries, academies, and institutions of learning, benevolence or charity . . . . founded, endowed and maintained by public or private charity." This definition is broad enough to include The Masonic Home and all similar institutions of charity; and unless the constitutionality of the act can be successfully assailed the judgment of the court below must be affirmed.

It should be noticed in the next place that this court has adopted and followed the legislative definition in several cases in which the question was fairly raised and squarely decided. The first of these was Burd Orphan Asylum v. The School District, 90 Pa. 21. The Burd Asylum was founded and endowed under the will of Mrs. Burd, "to establish an asylum for poor white female orphans." But not all poor white female orphans were entitled to admission. They were required to be of legitimate birth, not less than four nor more than eight years of age, and baptized in the Protestant Episcopal Church; preference being given to such orphans in the city of Philadelphia; after them to such orphans in the state of Pennsylvania.

If both city and state failed to fill the asylum with those who met all the requirements, then poor white female orphans within the required age might be admitted without regard to the place of their birth or the fact of their baptism. This was not a public asylum in the sense of being open to the general public. It was a denominational institution, under denominational control, open in the first instance to children baptized in the churches of the denomination, and if enough such could be found, then to no one else.

We held that such an institution was a charity. As it was administered in the interest of the helpless in the city and the state, it was a public charity; as there was no element of private or corporate gain in its organization or management, it was a purely—that is wholly—public charity. It was within the letter of the act of 1874, and within the spirit and intention of the constitutional provision.

In Boyd v. The Fire Insurance Patrol, 120 Pa. 624, we held that an organization whose purpose was to save life and property endangered by fires, without charge to the persons or to the owners of the property rescued by the efforts of the members and employees of the organization, was a charity. It was supported by contributions made by insurance companies and others, and rendered its services gratuitously whenever and wherever a fire occurred in the city. It was therefore a public charity; and as there was no profit or gain to its projectors or managers contemplated, and no return received from those benefited by its labors, it was wholly—that is purely—a public charity. The same doctrine was held in Philadelphia v. The Women's Christian Association, 125 Pa. 581; in Northampton County v. LaFayette College, 128 Pa. 132, and The Episcopal Academy v. Philadelphia, 150 Pa. 565. In each of these cases the act of 1874 was treated as a correct exposition of the constitutional provision. Other questions were raised and considered, but in no one of these cases has this court given expression to the slightest doubt about the constitutionality of the act of 1874, or attempted to give any other definition of the words "purely public charity" than that given by the legislature in that act. The same definition may be found in substance in Donohugh v. The Library Company of Philadelphia, 86 Pa. 306, in which we said that a purely public charity "is not necessarily one

solely controlled and administered by the state, but the phrase extends to and includes private institutions for purposes of purely public charity, and not administered for private gain." We defined the word "purely" in the same manner in that case as in the later cases above referred to, as meaning completely, entirely. The institution must not be administered for private gain, but completely, entirely, purely, in the interest of the charity. Upon this distinction the property of the Delaware County Institute was held liable to taxation: 94 Pa. 163. The advantages of that institute were confined to its members, and it was for that reason a private charity, if it could be regarded as a charity at all. The benefits came back to the members, who were necessarily the contributors, and no one else shared in them. It was not intended to serve the public, or to relieve in the slightest degree the public burdens, but to minister to the tastes and the intellectual improvement of those whose money purchased the books and provided for their care.

A provision for one's self, or for those for whom he is legally bound to provide, is private and personal in its object. It has no public purpose or work. So a hospital or school designed to secure to a town or a region better medical attention or better education than would otherwise be within the reach of such town or region, may be a charity in an important sense ; but if it is conducted with a view to private or corporate gain it is a private charity. If it is conducted and maintained by the gifts of individuals, or the public, for the benefit of its inmates, it is a public charity; and being free from the element of private or corporate gain it is a purely public charity, within the meaning and the letter of the act of 1874, and is protected from taxation by the list of decided cases already cited.

But let us suppose that the legislative definition of a purely public charity had not been made ; and the decisions cited had not been rendered ; and the question was now to be considered as one of first impression, how in such case ought it to be determined ?

The subject before the framers of the constitution was taxation. They declared this should be uniform, and levied under general laws, but some property ought not to bear taxation, and so exemption from the public burden came to be considered. This also must be regulated by general law, and not left

to the caprice or favoritism or prejudice of the lawmakers. Where may the legislature draw the line that shall separate the taxable from the non-taxable property of the state? This question was answered by the adoption of the well understood distinction between public and private uses. The words employed were "public property used for public purposes," that is property the title to which is in the public, and which is actually used for some public purpose; "actual places of religious worship," no matter who may own them or worship in them, for the support of public worship tends to the public improvement; "places of burial not used or held for private or corporate profit," for the gift of land to the public for purposes of burial is a gift to a public use; and finally, "institutions of purely public charity," or, in other words, institutions that are already ministering to the public and so ought not to pay taxes because public in the ends they serve, and without any element of private gain in their organization or management. This is the plain obvious meaning of the consecutive sentences devoted to the subject of exemption from taxation.

Moreover the reason for any exemption should be considered. Why ought any property to be exempt? Taxes are levied and collected to provide the public purse with money for the support of public institutions conducted by it and to defray public expenses, in the preservation of order, the administration of justice, and the support of public schools. A woman like Mrs. Burd, or a man like Stephen Girard or Isaiah Williamson devotes a large fortune to the founding and endowment of an institution intended to relieve the public burden, and advance the public good, by taking up some part of its work and doing it with more thoroughness and fidelity than the public could do it through its officers. The property of such an institution is not simply contributing like taxable property in general to the public good, but is devoted absolutely and irrevocably to it. The title may remain in trustees, but it is in effect dedicated wholly to public uses, with no element of private gain whatever. To levy taxes on property so given to a charitable use is unjust toward the benevolent giver, and is coldly cruel to the beneficiaries. This will be conceded as to the Burd Orphan Asylum and Girard College. To deny it would be to shock the public sense of justice. A majority of this court however

deny exemption to The Masonic Home; and the reasoning on which that denial rests would logically lead to a denial of it to all social, denominational or trade organizations providing for the education, support, medical treatment and burial of their members, their widows and orphans. What is The Masonic Home? It is a corporation whose object is set out in its charter, its constitution and its by-laws.

In the constitution, it is stated thus: " The object of said institution shall be to provide and sustain in the state of Pennsylvania one or more houses for destitute widows and orphans of deceased Freemasons of the state, and an infirmary or infirmaries for the reception and care of sick and afflicted Freemasons in indigent circumstances, and all such as may be placed under its charge by its managers."

In the by-laws it is stated in these words: " The Masonic Home shall have for its object to provide and maintain a home for indigent, afflicted or aged Freemasons, and for the destitute widows and orphans of Freemasons in the state of Pennsylvania, and for such others as may be placed under its charge."

It is conceded by my brethren that this is a charitable object, and that the home is a charity. The point taken is that it is a private, and not a public charity. It was founded and endowed, as the evidence clearly shows, and it is maintained, by voluntary gifts. Out of the contributions made to it, the grounds and buildings have been paid for, and the maintenance of its inmates provided. It is supporting, nursing and caring for thirty or more aged men who would otherwise be dependent upon the almshouse, or other forms of charity supported by taxation. No profit is possible to any person, corporation or society. The entire plant, and the stream of voluntary gifts on which it is dependent, are devoted wholly to the charitable work described in the constitution and by-laws of the home. The contributors get nothing for their money but the approval of their consciences, and the knowledge that they are increasing the happiness of the aged, indigent and afflicted.

I see nothing private about such a charity. It is not limited in its work to the donors or their children. It brings no pecuniary benefit or return. It is done in relief of public taxation, and in the interest of humanity, and that brotherly love that becomes the children of a common father. Preference is

given to members of the masonic fraternity, their widows and
orphans, but it is also open to all persons, regardless of their re-
lation to the masonic body, who may apply for admission and
be found by the managers to be suitable persons " to be placed
under its charge." Its doors are as wide as those of the Epis-
copal Academy, or the Burd Orphan Asylum, or the Girard
College. The requisites to admission are fewer and simpler.
They are, first, masonic connection and helplessness; next, help-
lessness and suitability for admission to an institution conduct-
ed in the manner adopted by the managers for the home. The
qualifications in both instances are to be judged of by the man-
agers. So in any almshouse or hospital or asylum, the fitness
of the applicant for admission must be determined by the proper
officer before the doors will open to him or her.

But it will perhaps be said that the purpose that moved the
contributors was to provide for masonic brethren and their fami-
lies, and that this ought to subject their gifts and their noble
charity to taxation. Then every denominational hospital, school
or asylum should be taxed for the same reason. All contribute
alike to the public good ; all alike relieve the public burden and
the taxpaying property of the commonwealth ; but all give, to.
some extent, preference to a particular class of the public, and
then open their doors to those outside the class who are within
the general purpose of the charity. The Women's Christian
Association has for its beneficiaries young unmarried women.
The Snug Harbor for Seamen provides for sailors. The Brick-
layers' Union, for a limited subdivision of house-builders. The
homes for mechanics, apprentices, newsboys, sewing women,
actors, disabled clergymen, and the like, all limit admission to
the class of persons described in the names they have adopted.
Indeed in all charitable institutions, whether founded and main-
tained by private beneficence or by public taxes, some principle
of selection prevails. The county poorhouse is for the care of
those whose legal settlement is within certain geographical lines,
and the wretch who cannot show his title to admission, on the
map, must starve on the outside. A member of the great pub-
lic may, like Lazarus, subsist on crumbs or die for want of them
at the gateway of a " public charity," if he belongs to another
" poor district." Such a thing as a charitable institution that
is open absolutely to the general public without limitation or

restriction, is not to be found in our state or country. Sailors and soldiers are cared for by the public in separate homes and separate hospitals. The state cares for injured miners in hospitals devoted to them exclusively. The deaf are in one institution, the dumb in another, the blind in a third. Hospitals are provided for consumptives, for persons afflicted with contagious or infectious diseases, for invalids whose diseases are of a nervous origin, and so on. The feeble-minded are gathered in one place, those crippled or deformed in body in another. The foundling has institutions to which it is admitted and from which others are excluded. Homes for aged persons, for aged couples, for fallen women, are open only to those for whom the charity was founded. Then too there are homes for widows, to admission to which a previous marriage and the death of a lawful husband are the necessary requisites. Schools for soldiers' orphans, from which all other children are excluded. Homes for decayed merchants, for superannuated and disabled clergymen, for disabled and aged firemen, and a long list of similar charities founded for a class of beneficiaries selected by reference to their trade, occupation, social position, denominational affiliation, age, color, disease, or place of residence. These are all engaged in ministering to the public needs, they all do some part of the work and bear some part of the burden that would otherwise fall upon the public. They are all public charities, and when free from any private or corporate gain are purely public charities. The institution now made subject to taxation by the decision just rendered is one of the many charities, doing the work of the public without the aid of public money, and doing it more tenderly, and more thoroughly, than it could be done in charitable institutions supported by taxation. Such institutions not only provide food and clothing and necessary medical attention to their inmates, but they go further, they seek to assuage the sorrows, and cheer the last days of those to whom they minister, and surround them with the comforts of a well-appointed home. For this added liberality and care they are declared to be private charities, and compelled to take part of the gifts of the benevolent from those they were intended to benefit, and use it to pay taxes upon property actually dedicated to the public use. The position of the city of Philadelphia in levying taxes upon such charities is ungracious.

It says in effect to them : " It is true your property represents the unselfish gifts of the benevolent; it is true that it is devoted to the relief of suffering, and the care of persons who must otherwise be chargeable to us. It is true that your work is for the public good and in relief of taxpayers, but you must do what we do not; you must ask no questions and take all who come. If you do not, then charity is a luxury which we shall tax you for. You must convert your home into a mere public almshouse, or else pay roundly for the privilege of carrying part of the public burden." The judgment of this court seems to be that the position of the city is correct, and that, notwithstanding the fact that a man or a society devotes a fortune to the care of the helpless and the relief of the taxpayers, the property occupied for the purposes of the charity so founded and maintained must be treated as a business investment and compelled to pay taxes, though the money used for that purpose is taken out of the mouths and off the bodies of the inmates. I dissent from the judgment and from the reasons on which it is rested. In my opinion nothing marks the advancement of the age in which we live so much as the growth of organized charity, in the increased care for the unfortunate and the helpless. This growth shows itself in the character of the hospitals, reformatories and asylums supported by the public funds. It is seen in a still more striking manner in the number and variety of richly endowed charitable institutions that owe their existence, and their power for good to the munificence of individuals. So long as sickness and poverty and misfortune are in the world, so long this field for private generosity will offer room for the labors and the fortunes of the benevolent. The better the field is occupied the better it will be for the public at large, and for the individuals who help to make up the indefinite body we call the public.

Now and then some piece of property used for charitable purposes may cease to pay taxes, but for every dollar so withheld from the public treasury many dollars will be saved to it by the relief of the public burdens by means of the charity so established. But if we lift our eyes from the tax list and consider the work done by these charities, of which there are several hundreds in this city alone, we shall see that the public gain from their labors and expenditures is incalculable. There

is probably no city on either side of the ocean so justly cele-
brated for the multitude of its charitable institutions as Phila-
delphia.    A distinguished citizen, who is himself actively iden-
tified with several of them, places the total number at about
six hundred.   Some of these are supported by public funds, but
most of them are monuments to the enlightened liberality of
private citizens who have given their money with a freedom
and discrimination that are without any parallel, at least in this
country.   It would be difficult to name a form of suffering that
has not been provided for by some generous man or woman
whose attention has, in some manner, been drawn to that par-
ticular field for charity.   The sums thus dedicated to the pub-
lic service make an enormous aggregate, and the institutions
supported by them embellish the city, and honor it.   The Ma-
sonic Home is one of these.   It now enjoys the undesirable
distinction of being the first admitted charity which has no
trace of private or corporate gain about its organization or man-
agement, to be condemned by this court to the payment of taxes
as the price of being allowed to go on with its unselfish work of
charity.   It carries part of the public burden.   It lifts what it
carries off the shoulders of the taxpayers.   It does this with a
stream of generous contributions from the pockets of private
citizens; but it is now judicially determined that it must take
the money contributed for the care of the sick, the infirm, the
aged, the afflicted, and use a part of it to pay taxes on the
buildings and grounds in which its work is carried on, and in
which the homeless and helpless are sheltered and fed.

I dissent wholly from the proposition that such charities are
private.   They are purely public.   They are within the act of
1874, as is admitted.   They are within our own cases beyond
any doubt.   They are within the intent and meaning of the
constitution, and are in my opinion clearly entitled to exemp-
tion from taxation.   I would affirm the judgment of the court
below.

Mr. Justice Green: I concur in the foregoing opinion.