## CONCHO CAMP, NO. 66, W. O. W., v. CITY OF SAN ANGELO. (No. 5722.)

(Court of Civil Appeals of Texas. Austin. May 25, 1921.)

**1. Taxation 241(3)—Voluntary association not exempt in view of use of lodge room and first story of building by others.**

A benevolent association whose lodge room was not only rented to other charitable institutions, but the first story of whose building was rented for commercial purposes, was not entitled to exemption from taxation on its property under Vernon's Sayles' Ann. Civ. St. 1914, art. 7507, prescribing what property shall be exempt from taxation, in view of Const. art. 8, § 2, conferring power on the Legislature to pass laws exempting institutions of purely public charity.

**2. Taxation 241(3)—Local camp of benevolent association not entitled to exemption in view of its life insurance feature; "purely public charity."**

Local camp of voluntary benevolent order *held* not entitled to exemption from taxation, under Vernon's Sayles' Ann. Civ. St. 1914, art. 7507, on account of its issuing insurance policies to its members, so that it was not an institution purely for public charity within the constitutional authorization of the Legislature to make exemptions. Const. art. 8, § 2.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Purely Public Charity.]

**3. Municipal corporations 962—Levies to pay for funding bonds and to pay off judgment on street improvement bonds not limitation on power of city to levy taxes for street improvements to extent of 15 cents per $100.**

In view of Vernon's Sayles' Ann. Civ. St. 1914, arts. 882, 924–926, and 937, levies made by the city of San Angelo to pay off funding bonds issued in 1903, and to obtain funds to pay off a judgment obtained against the city on street improvement bonds issued in 1899, *held* not to have constituted any limitation on the power of the city to levy taxes for street improvements to the extent of 15 cents on the $100.

**4. Municipal corporations 926, 951—Provision to pay interest on and create sinking fund for high school bonds in year of dating proper though they were not sold until next year.**

Where certain high school bonds issued by a city were to bear interest from May 1, 1914, it was proper that provision should be made to pay interest and create a sinking fund for the year 1914, as well as all subsequent years, though the bonds were not sold and in such sense not issued until June, 1915.

Appeal from District Court, Tom Green County; J. W. Timmins, Judge.

Suit by the City of San Angelo against Concho Camp, No. 66, Woodmen of the World. From judgment for plaintiff, defendant appeals. Affirmed.

Hill, Lee & Hill, of San Angelo, for appellant.

Jos. Spence, Jr., of San Angelo, for appellee.

KEY, C. J. Appellee brought this suit against appellant to recover taxes alleged to be due for the years 1909 to 1914, inclusive, on appellant's lot and lodge building in the city of San Angelo. Appellant defended upon the ground, first, that the property was exempt from taxation under the Constitution and laws of Texas; and, second, that, if not so exempt, some of the taxes sought to be recovered were illegal, because appellee had no power to levy and collect them. The case was submitted to the court without a jury, upon an agreed statement of facts, and judgment was rendered for appellee; and appellant has brought the case to this court and insists that the judgment should be reversed.

The case has been held under submission longer than usual, awaiting the decision of the Supreme Court in City of Houston v. Scottish Rite Benevolent Association et al., 230 S. W. 978, which case has been recently decided by that court.

Under the first and second assignments of error, appellant contends that the property is exempt from taxation. As pertinent to that question, we copy from appellant's brief the following statement:

"Appellee, in the years for which it seeks to recover taxes, was a municipal corporation, created and existing under the general laws of Texas. The plaintiff's first amended petition upon which the case was tried was in the usual form, and alleged that the appellant was a voluntary benevolent association owning the real estate described therein which was held for it

by its trustees. Appellant, besides its demurrers, filed a general denial and a special answer in which it denied liability for the taxes, its said special answer being as follows:

" 'For further and special answers herein, defendant denies that its said property in plaintiff's petition described was, for the years therein mentioned and alleged, subject to taxation by plaintiff, but it avers that the same was, under the Constitution and laws of Texas, exempt from taxation in this, that defendant was the owner of said lot and had erected thereon a two-story brick building, the upper story being used by defendant as a place for holding its meetings, and renting to other societies the use thereof for their meetings, and the lower or ground floor thereof was rented for a store; that said building was not used by defendant with a view of profit, and that all of the rents arising therefrom were appropriated by defendant solely to pay its current lodge expenses, and for the benefit of its sick and disabled members and their families, and for the burial of its members and their families, and for the maintenance of its members when unable to provide for themselves, besides other benevolent and charitable purposes often done and performed by it. Defendant avers that it is a local camp at San Angelo of what is known as the Woodmen of the World; that as such local camp it dispenses aid to its members and others in sickness or distress or death without regard to poverty or riches of the recipient; that its funds, property, and assets are placed and bound to relieve and minister to the relief of its members when in want, sickness, and distress, and to educate and maintain the orphans of its deceased members; that the sources of its income and means of raising money with which to discharge its benevolent and charitable purposes is raised by monthly dues upon its members and the rental from said building, all of which is appropriated and used for the purposes aforesaid, that by reason of the facts the defendant is, within the meaning of the Constitution and laws of Texas, a public charity, engaged in a purely charitable work, and as such its property, money, and assets are exempt from taxation, and this it is ready to verify.'

"The admitted facts show that appellant is a local subordinate camp of the Sovereign Camp of the Woodmen of the World; that said Sovereign Camp of the Woodmen of the World is a fraternal, beneficiary, benevolent society, organized and existing under the name of the Sovereign Camp of the Woodmen of the World, with head office at Omaha, Neb., the object of the society being to combine its members into a secret, fraternal, beneficiary and benevolent society; to comfort the sick, and cheer the unfortunate by attention and ministrations in time of sorrow and distress; to promote fraternal love and unity; to create a fund out of which, on the death of a member, a sum not exceeding $3,000 may be paid to the beneficiary named by the deceased member, and to erect a monument at his grave, such fund for the payment of the death losses to the beneficiary, and the erection of a monument to the deceased member, being raised by advance assessments against each member taking insurance therein, based upon his age at nearest birthday at date of his admission as a member, according to a specified table prescribed by said Sovereign Camp according to the amount of insurance taken.

"The appellant is a local camp of said society at San Angelo, Tex., and under the jurisdiction of the Sovereign Camp having its head office at Omaha, Neb., and collects from each beneficiary member the advanced assessments under benefit certificates which may be issued to him, and remits the same to the Sovereign Camp at Omaha, Neb.

"The appellant, for the years 1909 to 1914, inclusive, owned the west 25 feet of lot No. 7, block 13, in the city of San Angelo, upon which it had a two-story brick building erected, the second story of which is used as a lodge room for the purpose of holding the meetings of the local society, and is also used by other societies, who pay rent to appellant for such use; the ground floor of said building is used by appellant for rental purposes, and during the years mentioned was rented and occupied as a store, monthly rentals being paid by the tenant to appellant.

"The title to said property is held and vested in appellant, and the Sovereign Camp has no title or interest in said lot and building, and none of the rents or revenues therefrom go to or constitute any fund to the Sovereign Camp having its head office at Omaha, Neb., and no part thereof is used for the payment of death losses and monument purposes.

"Appellant levies and collects from its members monthly dues of 35 cents per month, which, together with rents received by defendant from said building, constitute a fund wholly under the control, use, and disposition of appellant, over which the Sovereign Camp of Omaha, Neb., has no control whatever; that said monthly dues and rents aforesaid are appropriated by appellant solely to sustain it and to pay its current expenses, and for the benefit of the sick and disabled members, and their families, and the burial of the same, and for the maintenance of members when unable to provide for themselves, and the fund so arising from said rentals and monthly dues are bound by the laws of the society to relieve, aid and minister to the relief of its members when in want, sickness and distress, and to maintain the orphans of its deceased members. If defendant did not receive the rents from said building, it would have to increase its monthly dues in order to meet the expenses incident to dispensing aid to its members and others in sickness and distress, and to provide for its helpless and dependent members an aid in the education and maintenance of the orphans of its deceased members.

"That, in addition to dispensing aid to its own members, it also dispenses, out of said fund arising from said dues and rentals, aid and assistance to members of other local camps coming to San Angelo in search of health, and for other purposes, and contributes out of said fund to other charitable purposes such as the Galveston sufferers, and other similar calamities, the aid and assistance, however, to members of other local camps and sufferers, being voluntary on the part of the camp, and not obligatory."

It is contended on behalf of appellant that its property comes clearly within the scope of article 7507, Vernon's Sayles' Ann. Civ. St.

1914, prescribing what property shall be exempt from taxation. But, if that contention be conceded, it must be held that the statute is in conflict with article 8 of the Constitution which regulates the subject of exemptions from taxation. That article makes no specific exemption of anything except $250 worth of household and kitchen furniture; but the second section confers power upon the Legislature to pass laws, exempting, among other things—

"All buildings used exclusively and owned by persons * * * for school purposes (and the necessary furniture of all schools), and institutions of purely public charity; and all laws exempting property from taxation, other than the property above mentioned, shall be void."

[1] In the City of Houston v. Scottish Rite Benevolent Association, above referred to, the Supreme Court seems to have' modified the rule announced in Morris v. Masons, 68 Tex. 701, 5 S. W. 519, upon the question of what constitutes a purely public charity within the purview of the Constitution. It was there held that, in order to obtain the benefit of the exemption, the property must not only be an institution for purely public charity, but·must also be used exclusively by the owner; and that it does not satisfy that constitutional requirement, because the use by others was permitted by the owner to obtain revenues to be devoted entirely to the owner's work of purely public charity. The court said:

"The actual, direct use must be exclusive on the part of such an institution as is favored by the constitutional provision." ·

And because in that case the owner of the property had permitted others to use a portion of it, it was held that the property was not exempt from taxation. That ruling applies to this case, because appellant's lodge room was not only rented to other charitable institutions, but the first story of the building was rented for commercial purposes.

[2] We also hold that in this case appellant is not entitled to the exemption, because of the fact that it issues insurance policies to its members; and therefore it is not an institution purely for public charity. Counsel for appellee have incorporated in their brief an able opinion prepared by Attorney General C. M. Cureton, and we copy therefrom and adopt the following:

"We now come down to the question as to whether or not fraternal beneficiary associations are institutions of 'purely public charity.'

"Section 1 of chapter 113, General Laws of the Thirty-Third Legislature (Vernon's Sayles' Ann. Civ. St. 1914, art. 4827), being our fraternal beneficiary·act, by which title we will hereafter refer to it in this opinion, declares:

" 'Any corporation, society, order or voluntary association, without capital stock organized and carried solely for the mutual benefit of its members and their beneficiaries, and not for profit, and having a lodge system with ritualistic form of work and representative form of government, and which shall make provision for the payment of benefits in accordance with section 5 hereof, is hereby declared to be a fraternal benefit society.'

"Section 5 of the act (article 4831) sets forth the benefits which institutions of this character may provide for in their certificates, and provides in substance that every such society transacting business under this act shall provide for the payment of death benefits, and may provide for the payment of benefits in the case of temporary or permanent physical disability, either as the result of disease, accident, or old age. It likewise provides for qualified policy loans and the granting to members with paid-up insurance policies protection and withdrawal equities, somewhat after the manner of old line insurance companies.

"Section 8 (article 4834) provides that every certificate issued by such societies shall specify the amount of benefit provided thereby and the charter or articles of incorporation, constitution, by-laws, etc., shall be a part of the certificate and agreement between the association and its policy holders.

"Section 6 (article 4832) declares to whom the benefits may be payable, and limits the benefits to wife, husband, relative by blood to the fourth degree, father-in-law, mother-in-law, son-in-law, daughter-in-law, stepfather, stepmother, stepchildren, children by legal adoption, or to a person or persons dependent upon a member, etc.

"Other sections of the act govern the investment and distribution of the funds of the society, which may be only used in the manner set forth and for the purposes provided in the law.

"Institutions of this character are plainly insurance companies and not in any sense of the words 'benevolent and charitable institutions.' This has been expressly decided by the Supreme Court of this state in the case of Farmer v. State, 69 Tex. 561 [7 S. W. 220]. In that case a corporation known as the Masonic Mutual Benevolent Association announced in its charter that its purpose was to provide for its members during life and for their families after death. To accomplish this a contract was made with each member who joined the society that, for a sum of money paid, and for designated installments of money to be paid afterwards, the association would, after the member's death, pay to the designated beneficiaries a sum graduated in amount according to the length of time the member lived after he became a member. An examination by a physician was required of each member, and membersip was forfeited for nonpayment of assessments. The Supreme Court, as suggested, held that the contract had all the elements of a life insurance policy, and that, though it had been entered into for a benevolent purpose, yet the corporation could not legally exist unless incorporated in accordance with the laws of the state regulating the incorporation of insurance companies, and that it could not be chartered under the statutes of this state, providing for the incorporation of benevolent associations. In that case the

court, speaking through Chief Justice Willie, said:

" 'This contract has all the features of a life insurance policy. It is a contract by which one party for a consideration promises to make a certain payment of money upon the death of the other; and it is well settled that, whatever may be the terms of payment of the consideration by the assured, or the mode of estimating or securing payment of the insurance money, it is still a contract of insurance, no matter by what name it may be called. Comm. v. Weatherbee, 105 Mass. 149; State v. Farmer's Benevolent Ass'n, 18 Neb. 281 [25 N. W. 81].

" 'It is in effect the ordinary contract made by insurance companies with the assured, differing from it in no important respect. The terms of payment are somewhat different, the amount being greater or less, accordingly as the member lives long or dies early; still it is a payment to be made at his death. The assured cannot be forced by suit to pay future premiums; but he loses his membership if he defaults in this respect. It is a common provision in insurance policies, that, if the assured fails to perform some of the conditions of his contract, that his policy may be canceled, and the premiums paid shall, in that event, become forfeited to the company. The provision that membership may be forfeited for nonpayment of assessments is in effect the same thing, for the assessments serve the purposes of premiums in an ordinary life policy. The examination which precedes admission into membership is the same as that which occurs before the issuance of a policy, and is intended to secure the society against fraud or imposition; to prevent an unsound person from becoming insured, and to reduce its risks of loss, or increase its chances of profit.

" 'It matters not that the member was entitled to benefits in case of sickness. Insurance can be effected upon the health as well as the life of an individual. These benefits, too, are incidental to the main object of the institution, and the certificates issued by it are none the less policies of insurance, though the insured derive sums of money from the contract other than those for which he has specially bargained.

" 'We are of opinion, therefore, that the appellants constituted an insurance company within the spirit and true meaning of that term, and not an association conducted in the interest of benevolence, as contemplated by title 20 of our Revised Statutes. This question has been frequently before the courts of other states, and, so far as we can ascertain, has been universally decided in accordance with the opinion above expressed.

" 'In Bolten v. Bolten, 73 Me. 299, the subject underwent thorough investigation, and an institution with purposes similar to the present was held a mutual life insurance company. In State v. Lietchelt, 32 N. W. 787, the Supreme Court of Minnesota held a company formed by unmarried men, with the purpose of endowing the wife of each member upon marriage with a sum of money equal to the then number of members not to be a benevolent association. The members paid a quid pro quo, and did not receive their money as an act of benevolence on the the part of their fellow members.

" 'In State v. Tex. Benevolent Association, supra, a society with a constitution like the present was held an insurance company, within the meaning of a statute similar to our own.

" 'The benefits received are not gratuitous. They are due to the members on account of the money he pays into the society. It takes the risk of his continued existence and good health. If it be benevolence to pay our money under such circumstances then every mutual life insurance company is acting in a benevolent manner towards the family of an insured member when it pays the policy it has issued them for a money consideration. It matters not what name the association may assume. The law looks to the real objects of the body and not to the name indicative of benevolence which it may have assumed.

" 'These views will be found supported by the following authorities in addition to those already cited: May on Ins., § 550; State v. Citizens' Ass'n, 6 Mo. App. 163; State v. Merchants,' etc., Ass'n, 72 Mo. 146; People v. Wilson, 46 N. Y. 477; State v. Standard Life Ass'n, 38 Ohio, 281.' 69 Tex. 566, 567 [7 S. W. 222, 223].

"This case would seem to settle the question that a fraternal beneficiary association is not a charitable or benevolent association, much less could it be considered an institution of 'purely public charity.' The rule is laid down in 37 Cyc. 931, as follows:

" 'In some states it is considered that fraternal associations, such as the Masonic order, and the Odd Fellows, are to be classed as "charitable" or "benevolent" institutions on account of their philanthropies, and therefore entitled to hold their property exempt from taxes; while a contrary doctrine is that the fact of their relief work being confined to members of the order and their families removes them from the class of public charities, so that they are not entitled to exemption. In some cases, it is held that the question depends upon whether the exemption granted is in terms restricted to institutions of "purely public charity" or applies generally to "charitable institutions." Where the principal object of a fraternal order is to provide for the payment of sick benefits to members and special payment to the next of kin or designated beneficiaries of deceased members out of funds raised by dues and assessments, it is not a charitable organization, but in the nature of an insurance company, and its property is not exempt.'

"The last phrase quoted is supported by a long line of authorities, cited by the authority from which we have quoted, and by others which we have collated. Those cited in support of the text are shown in 37 Cyc. p. 932, note 27, as follows: Illinois—Supreme Lodge M. A. F. O. v. Effingham County Bd. of Review, 223 Ill. 54, 79 N. E. 23 [7 Ann. Cas. 38]; State Council of Catholic Knights v. Effingham Co. Bd. of Review, 198 Ill. 441, 64 N. E. 1104. Kansas—National Council K. & L. S. v. Phillips, 63 Kan. 799, 66 Pac. 1011. Massachusetts —Young Men's Protestant, etc., Soc. v. Fall River, 160 Mass. 409, 36 N. E. 57. Mississippi —Ridgeley Lodge No. 23 I. O. O. F. v. Redus, 78 Miss. 352, 29 South. 163. Nebraska—Royal Highlanders v. State, 77 Neb. 18, 108 N. W. 183, 7 L. R. A. (N. S.) 380. New York— Matter of Jones, 1 Con. 125, 2 N. Y. Supp.

671. South Dakota—Masonic Aid Association v. Taylor, 2 S. D. 324, 50 N. W. 93. England—In re Linen, etc., Drapers', etc., Inst., 58 L. T. Rep. N. S. 949.

"In addition to the authorities just cited, we also direct your attention to the following: State Council C. K. of I. v. Board of Review [198 Ill. 441] 64 N. E. 1104; Royal Highlanders v. State [77 Neb. 18, 108 N. W. 183] 7 L. R. A. (N. S.) 380; Desty on Taxation, vol. 1, p. 114; City of Newport v. Masonic Temple Association, 108 Ky. 333, 56 S. W. 405, 49 L. R. A. 252; Widows' & Orphans' Home v. Bosworth [112 Ky. 200] 65 S. W. 591; Philadelphia v. Masonic Home [160 Pa. 572, 28 Atl. 954] 23 L. R. A. 545 [40 Am. St. Rep. 736]; National Council, etc., v. Phillips [63 Kan. 799] 66 Pac. 1011; Fitterer v. Crawford [157 Mo. 51, 57 S. W. 532] 50 L. R. A. 193.

"In the case of Royal Highlanders v. Nebraska, cited above, it was held by the Supreme Court of that state that a fraternal beneficiary association conducted for the mutual benefit of its members and for the purpose of providing a fund by the payment of stated dues and fees by such members, and providing for the payment of a special amount on the death of each member to a beneficiary named by him, was not a charitable association, and that its property was not exempt from taxation under the laws of the state exempting property used exclusively for charitable purposes.

"The annotator annotating this case for the L. R. A. system, in his note states: 'The general rule established by the decisions is in accord with the Royal Highlanders v. State, holding that fraternal benefit societies, not organized for profit or gain, but purely for the purpose of paying indemnity upon the death of their members, for an agreed compensation, are, in effect, life insurance companies, and not charitable or benevolent institutions, within the meaning of statutory provisions exempting the property of such institutions from taxation.'

"He cites a number of cases in support of the conclusion stated in his note, and gives a brief analysis of each case. Among the cases cited are the following: National Council K. & L. of S. v. Phillips [63 Kan. 799] 66 Pac. 1011–1014; State Council C. K. v. Effingham County [198 Ill. 441] 64 N. E. 1104; Supreme Lodge M. A. F. O. v. Effingham Co. [223 Ill. 54] 79 N. E. 23; Jones' Estate [1 Con. 125] 2 N. Y. Supp. 671; Young Men's Benevolent Society v. Fall River [160 Mass. 409] 36 N. E. 57."

For both of the reasons stated, we hold that the property was not exempt from taxation.

Under several assignments of error it is contended that the city of San Angelo exceeded the constitutional limitation of 15 cents on the $100 for streets, roads, and bridges, when it levied certain taxes for each of the years here involved for the purpose of paying interest and providing a sinking fund for certain funding bonds, issued for the purpose of paying off a former debt; and concerning that matter we copy this statement from appellee's brief:

"The city of San Angelo, in the years 1909 to 1914, both inclusive, had a population of more than 10,000 inhabitants. Said city assumed charge of its public schools in 1903, and has continued such control ever since.

"Prior to the year 1903 the city was incorporated under the general laws of Texas, and on the 1st day of May, 1889, issued $10,000 street improvement bonds under the laws authorizing same to be done. Thereafter said incorporation was dissolved by vote of the people, and remained so until again incorporated in 1903, and immediately after incorporation, and during the year 1903, the city of San Angelo passed an ordinance authorizing the funding of the old city of San Angelo street improvement bonds, said ordinance providing for the issuance of said funding bonds, and the creation of a sinking fund to pay said bonds, which said bonds were afterwards issued in payment of the indebtedness of the city incurred under the former incorporation, these bonds called in the ordinance 'funding bonds of the city of San Angelo,' and are commonly known as 'the Shapleigh bonds,' he being the owner of the indebtedness for which said bonds were issued in payment, and plaintiff in the judgment rendered in favor of August F. Shapleigh against the city of San Angelo in the Circuit Court of the United States, rendered on the 6th day of November, 1899. The tax levies made by the city for the years 1909 to 1914, inclusive, are as follows:

**For 1909:**

| | |
|---|---|
| For general purposes | .25 |
| For streets, roads, and bridges | .15 |
| For permanent improvements | .05 |
| For maintenance of public free schools | .50 |
| For interest and sinking fund for street improvement bonds (being the Shapleigh bonds) | .03 |
| For interest and sinking fund for schoolhouse bonds | .05 |
| For interest and sinking fund on ward school bonds of 1908 | .06 |
| For interest and sinking fund on ward school bond No. 2 of 1909 | .06 |
| **Total** | **$1.15** |

**For 1910:**

| | |
|---|---|
| For general purposes | .25 |
| For streets, roads, and bridges | .15 |
| For permanent improvements | .04 |
| For public free schools | .50 |
| For interest and sinking fund for street improvement funding bonds (these being the Shapleigh bonds) | .03½ |
| For redemption of schoolhouse bonds | .04½ |
| For redemption of ward school bonds of 1908 | .05 |
| For redemption of ward school bonds No. 2 of 1909 | .05 |
| For redemption of fire station bonds | .03 |
| **Total** | **$1.15** |

**For 1911:**

| | |
|---|---|
| For general purposes | .25 |
| For streets, roads, and bridges | .11 |
| For redemption of $20,000.00 City of San Angelo street improvement bonds, theretofore levied out of the road and bridge fund | .04 |
| For permanent improvements | .07 |
| For free schools | .50 |
| For interest and sinking fund for street improvement funding bonds (these being the Shapleigh bonds) | .03 |
| Schoolhouse bonds | .04 |
| For ward school bonds of 1908 | .04½ |
| For ward school bonds No. 2 of 1909 | .04½ |
| For fire station bonds | .02 |
| **Total** | **$1.15** |

For 1912:

| | |
|---|---|
| For general purposes................................ | .50 |
| For streets, roads, and bridges................ | .05 |
| For interest and sinking fund for redemption of $20,000 street improvement bonds of 1911 out of road and bridge fund................... | .03 |
| For redemption of $50,000 street and bridge bonds of 1912, heretofore levied out of road and bridge fund................................. | .07 |
| For permanent improvements.................... | .08 |
| For maintenance of public free schools in said city ...................................... | .50 |
| For interest and sinking fund for street improvement funding bonds (these being the Shapleigh bonds) ............................... | .03 |
| For schoolhouse bonds............................ | .04 |
| For ward school bonds of 1908.................. | .04 |
| For ward school bonds No. 2 of 1909............ | .04 |
| For fire station bonds............................ | .02 |
| **Total** ........................................ | **$1.40** |

For 1913:

| | |
|---|---|
| For general purposes............................ | .50 |
| For streets, roads, and bridges................ | .08½ |
| For redemption of $20,000 street improvement bonds of 1911 out of road and bridge fund... | .02 |
| For interest and sinking fund for $50,000 street and bridge bonds of 1912 out of road and bridge fund ................................. | .04½ |
| For public free schools.......................... | .50 |
| For interest and sinking fund for street improvement funding bonds (these being the Shapleigh bonds) ............................... | .03 |
| For schoolhouse bonds............................ | .03 |
| For ward school bonds of 1908.................. | .03 |
| For ward school bonds No. 2 of 1909........... | .03 |
| For fire station bonds............................ | .01½ |
| **Total** ........................................ | **$1.40** |

For 1914:

| | |
|---|---|
| For general purposes............................ | .45 |
| For park purposes................................ | .05 |
| For road and bridge fund proper................ | .05 |
| For redemption of $20,000 street improvement bonds of 1911 out of road and bridge fund.. | .01½ |
| For redemption of $50,000 street and bridge bonds of 1912 out of road and bridge fund... | .04½ |
| For redemption of $15,000 street and bridge bonds No. 2 of 1914 out of bridge fund...... | .04 |
| For permanent improvement fund proper.... | .06½ |
| For interest and sinking fund for redemption of city of San Angelo street improvement funding bonds (these being the Shapleigh bonds) ............................................. | .02 |
| For schoolhouse bonds............................ | .01 |
| For ward school bonds of 1908.................. | .02½ |
| For ward school bonds No. 2 of 1909............ | .02½ |
| For fire station bonds............................ | .00½ |
| For $80,000 high school bonds of 1914.......... | .10 |
| For public free schools.......................... | .50 |
| **Total** ........................................ | **$1.40** |

[3] We do not concur in appellant's contention that the levies made for the purpose of paying off funding bonds that were issued in 1903, for the purpose of obtaining funds to pay off the judgment which had been obtained against the city on street improvement bonds, issued in 1889, constituted any limitation upon the power of the city to levy taxes for street improvements to the extent of 15 cents on the $100. Suit had been brought upon the bonds referred to, and judgment obtained against the city of San Angelo, and that judgment constituted a valid charge against all the property within the city limits subject to taxation. In our opinion, the city of San Angelo had the power to issue bonds for the purpose of obtaining funds to discharge that judgment, and the bonds so issued and the provision made for their payment did not in any wise limit the power of that municipality to levy and collect 15 cents on the $100 for street improvements. Vernon's Sayles' Civil Statutes of 1914, arts. 882, 924, 925, 926, and 937.

[4] At an election held March 25, 1914, and an ordinance passed in pursuance thereof April 6, 1914, an issuance of $80,000 high school bonds was authorized to be dated May 1, 1914, and bear interest from that date at 5 per cent. per annum, payable semiannually. On March 22, 1915, the city, having offered the bonds for sale, accepted the bid of the First National Bank of San Angelo to purchase the same at par, accrued interest, and premium of $150, subject to the approval by the Attorney General, registration by the comptroller, and waiving of the right to purchase by the State Board of Education, and the bank was required to have the bonds printed. The bonds were approved by the Attorney General, and registered by the comptroller June 3, 1915; the State Board of Education waived its right to purchase June 4, 1915, and on June 10, 1915, the bonds were delivered to the bank, and the purchase money paid to the city. The first year's interest on the bonds, when paid to the city, was by it paid over to the school board, which used the same. Appellant's property for 1914 was assessed at $2,500, and on September 8, 1914, the city made a levy of 10 cents on the $100 valuation for the interest and sinking fund on said bonds. The bonds were dated May 1, 1914, and bore interest from that date. Inasmuch as the bonds were not in fact issued and sold until after the expiration of the year 1914, appellant contends that the levy and collection of taxes for that year is illegal, and in support of that contention cites Nalle v. City of Austin, 42 S. W. 780, and Petty v. McReynolds, 157 S. W. 180.

In the Nalle Case the question referred to was not decided on appeal. It seems that the trial court had ruled in favor of Nalle upon a somewhat similar question, but had rendered a judgment against him for a certain amount, and he appealed. The ruling referred to being in his favor, of course he did not complain of it on appeal; nor does it appear that there was any cross assignment complaining of it. While it is true that it is stated in one place that this court adopted the trial court's findings of fact and conclusions of law, in concluding the opinion, Chief Justice Fisher said:

"We do not care to discuss the various questions raised by the assignments of error, as, in our opinion, the conclusions of the court below were correct on all the points presented. We find no error in the judgment, and it is affirmed."

Thus, it will be seen that this court limited its decision to the complaints made by Nalle,

and these complaints did not include the question under consideration. In refusing an application for a writ of error in that case, the Supreme Court wrote an opinion, but not upon that question. See Nalle v. City of Austin, 91 Tex. 424, 44 S. W. 66. In fact, that question was not presented on appeal in either court.

In the case of Petty v. McReynolds, referred to above, the facts are not analogous, and it was there held that where, after the levy of a tax, the purpose for which it was levied was abandoned, and the commissioners' court, without authority, attempted to transfer the tax to a fund for another purpose, such action upon the part of the commissioners' court was illegal, and could be restrained.

So it is not made to appear that any appellate court has rendered a decision sustaining appellant's contention, and it does not appeal to us as being sound. According to the terms of the contract of sale, the bonds in question in this case were to bear interest from May 1, 1914, and therefore it seems that it was just and proper that provision should have been made, as it was, to pay interest and create a sinking fund for that year as well as all subsequent years. The fact that the bonds were not sold, and in that sense not issued until June, 1915, in our judgment, ought not to require a decision on this point in appellant's favor. In fact, the bonds were sold, and the city of San Angelo obtained and applied to the use of its free schools the money for which they were sold. This being the case, it is nothing but fair and right that all the property subject to taxation within the city of San Angelo should be required to contribute to the fund required to pay interest and create a sinking fund from the date of the bonds to the time of their maturity. To hold otherwise might result in much inconvenience and confusion, if it did not frustrate the purpose of the law. Before such bonds can be disposed of, they must be submitted to the Attorney General, and approved by him; also the school board has the preferential right to purchase them; and therefore it is important, if not absolutely necessary, that they should be dated and signed by the proper officers of the municipalities issuing same, before submitting them to the Attorney General and state school board; and, necessarily, a considerable time may elapse before the approval of the Attorney General and the waiver of the school board to purchase can be obtained; and, no matter whether the bonds bear date prior to the time they are actually signed, or subsequent to that time, they may not be ready for actual manual delivery to the purchaser until after the time they bear date, and during the next calendar year.

In this case it is not shown nor claimed that there was any unreasonable delay in disposing of the bonds; and therefore, and for the other reasons given, we overrule appellant's contention, and hold that it is liable for the amount levied to pay interest and create a sinking fund on school bonds from the year 1914.

No reversible error has been shown, and the judgment is affirmed.

Affirmed.