# SUPREME COURT,

## STATE OF KANSAS.

## JANUARY TERM, 1903.

*PRESENT:*

Hon. FRANK DOSTER, Chief Justice.
Hon. WILLIAM A. JOHNSTON,
Hon. WILLIAM R. SMITH,
Hon. EDWIN W. CUNNINGHAM,  } Justices.
Hon. ADRIAN L. GREENE,
Hon. JOHN C. POLLOCK,
Hon. ROUSSEAU A. BURCH,

JAMES A. TROUTMAN *et al.* v. THE DEBOISSIERE ODD FELLOWS' ORPHANS' HOME AND INDUSTRIAL SCHOOL ASSOCIATION *et al.*

No. 11,822. (71 Pac. 286.)

SYLLABUS BY THE COURT.

CONVEYANCE—*Invalid Gift to Orphans' Home.* An instrument of writing purporting to convey lands to trustees and their successors in perpetual trust to provide a home and school for the maintenance and education of the children of the deceased members of a secret society is not a gift for purposes of a public charity, and is void as against the rule prohibiting perpetuities of title in estates.

Error from Franklin district court; SAMUEL A. RIGGS, judge. Opinion filed January 10, 1903. Reversed.

1—66 KAN.

*John W. Deford, William H. Clark, Troutman & Stone,* and *G. C. Clemens,* for plaintiffs in error.

*George A. Huron, Benson & Harris,* and *M. B. Nicholson,* for defendants in error.

The opinion of the court was delivered by

DOSTER, C. J.: This was an action to set aside the following deed made by Earnest Valeton DeBoissiere:

## "DEED OF TRUST.

"THIS INDENTURE, Made this 11th day of May, 1892, between Earnest Valeton DeBoissiere, a single man, of Franklin county, in the state of Kansas, party of the first part, and Louis C. Stine, George A. Huron, Milo B. Ward, George W. Jones, and Charles L. Robbins, and their successors in office, as trustees of the party of the third part, in the state of Kansas, parties of the second part, and The DeBoissiere Odd Fellows' Orphans' Home and Industrial School Association, of Kansas, party of the third part,

"WITNESSETH : That said party of the first part, in consideration of the sum of one dollar, the receipt of which is hereby acknowledged, and in the further consideration of a spirit of philanthropy and good will on the part of said first party, and of a desire on his part to assist in making a provision for the orphans of deceased Odd Fellows of the state of Kansas, does by these presents grant, bargain, sell and convey unto said parties of the second part, their successors and assigns, all the following-described real estate, situated in the county of Franklin and state of Kansas, to wit : (Description omitted.)

"To have and to hold the same, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, forever, in fee ; in trust, nevertheless, and to and for the uses, interests and purposes hereinafter limited, described and declared ; that is to say :

"*First:* In trust to provide a home upon said prem-

Troutman v. DeBoissiere.

ises for the orphan children of deceased Odd Fellows of the state of Kansas.

"*Second:* To control and manage the same as an industrial school and farm, and to maintain thereon such schools and mechanical shops as may be necessary and convenient for the use of the farm and for the education of the inmates of said home in domestic and mechanic arts, including instruction in mechanical trades, agriculture, plane geometry, practical surveying, practical chemistry, practical geology, practical physics, and practical veterinary surgery.

"*Third:* The children in said home who are able to do farm or garden work are to be reasonably employed, and account kept by the hour, and the reasonable value of such work paid to the support of said home.

"*Fourth:* All products to be used, so far as necessary, in carrying on said home, but to be accounted for at a fair market price.

"*Fifth:* Said first party hereby reserves the right, during his natural life, to reside upon said premises, and said parties of the second part are hereby required to provide him with suitable rooms in said home, comfortably furnished and kept, and to provide him with proper board and care without charge, whenever he shall choose to occupy the same.

"*Sixth:* The net income of the farm to be applied by said parties of the second part to improvement and necessary repairs of said premises and buildings thereon, and the employment of the teachers in the industrial school herein provided for. And the support of the children in said home, for every kind of expenses except teaching, to be provided by the Odd Fellows of Kansas. And said party of the first part, being a single man, does hereby covenant, promise, and agree that the within-described premises are free, clear and discharged of and from all encumbrances, of whatever nature or kind soever; and that he will warrant and forever defend the same unto parties of the second part and the parties of the third part, their heirs and assigns, against said party of the first part,

his heirs, and all and every person or persons whomsoever, lawfully claiming or to claim the same.

"And the said parties of the second part covenant faithfully to perform and fulfil the trust herein created.

"IN WITNESS WHEREOF, the said parties have hereunto set their hands, the day and year first above written.              · E. V. DEBOISSIERE,
                                   *Party of the first part.*
                    LOUIS C. STINE,
                    GEORGE A. HURON,
                    MILO B. WARD,
                    GEORGE W. JONES,
                    CHARLES L. ROBBINS,
                                   *Parties of the second part.*"

The case has been under consideration for a long time. At the March sitting for 1901 a judgment of affirmance was rendered by a divided court. (64 Pac. 33.) A petition for rehearing was allowed, a re-argument had, and since then we have given to the questions presented much careful consideration. The conclusion of the majority of the court now is that a judgment of reversal should be ordered.

That the foregoing deed is void on its face, unless the trust it attempts to create is a public charity, is beyond controversy, for it violates the rule against perpetuities of title in estates. Not only by necessary implication, derivable from the recital of its object, but by its express language, it vests a perpetual trust in the described lands in the trustees named and their successors. Therefore, the only question is whether the trust the instrument attempts to create is in aid of a public charity, because trusts in perpetuity in aid of such object are not within the prohibition of the rule. Obviously that question depends on the definition of a public charity, and concerning that definition there should not be, in reason, much dispute. We may

differ as to whether a particular case comes within the definition, but the definition itself must be fixed and unvarying, else there can be no law on the subject, and each case would be made to depend on the arbitrary will of the judges.

Much learning has been displayed, in judicial opinions and in law-books, in the discussion of the question whether, antecedent to the statute of Elizabeth (43 Eliz.), chancery exercised the jurisdiction it now possesses with reference to charities, but the learning is more curious than important.    The cases decided before that statute are only matter of history, and none of them is ever cited now as an authority concerning the law itself.    Judge Story says:

"But however extensive the jurisdiction may originally have been over the subject of charities, and however large its application, it is very certain that since the statute of Elizabeth no bequests are deemed within the authority of chancery, and capable of being established and regulated thereby, except bequests for those purposes which that statute enumerates as charitable, or which by analogy are deemed within its spirit and intendment.    A bequest may in an enlarged sense be charitable, and yet not within the purview of the statute.    Charity, as Sir William Grant (the master of the rolls) has justly observed, in its widest sense, denotes all the good affections men ought to bear towards each other; in its more restricted and common sense, relief to the poor.    In neither of these senses is it employed in the court of chancery.    In that court it means such charitable bequests only as are within the letter and the spirit of the statute of Elizabeth."    (2 Story, Eq. Jur. § 1155.)

Judge Story summarizes the charitable uses provided for by the statute of Elizabeth as follows:

"The uses enumerated in the preamble of the statute as charitable are gifts, devises, etc., for the relief of aged, impotent and poor people; for the mainte-

Troutman v. DeBoissiere.

nance of sick and maimed soldiers and mariners; for schools of learning, free schools, and scholars of universities; for repairs of bridges, ports, havens, causeways, churches, sea-banks, and highways; for education and preferment of orphans; for or towards the relief, stock or maintenance for houses of correction; for marriages of poor maids; for supportation, aid and help of young tradesmen, handicraftsmen, and persons decayed; for relief or redemption of prisoners or captives; and for aid or ease of any poor inhabitants, concerning payments of fifteenths, setting out of soldiers, and other taxes. These are all the classes of uses which the statute in terms reaches." (2 Story, Eq. Jur. § 1160.)

It will be observed that every one of these uses was, under English law, a strictly public use. Everything proposed was a thing which the government itself might properly do, for it was the business of government to repair churches even, since religion was a state affair, and parliament had the undoubted power to provide from public funds for "marriages of poor maids" by giving them portions as inducements to bashful swains. Every purpose proposed was a *public* purpose—under English law, a *governmental* purpose. The settled definition of "public charities" has agreed with this view, however widely some courts may in recent times have departed from that definition in the decision of particular cases. Thus:

"Definition of charity: A gift to a general public use, which extends to the poor as well as to the rich: many instances in the statute 43 Eliz. carrying this idea, as for building bridges, etc. The supplying of water is necessary as well as convenient for the poor and the rich." (*Jones v. Williams*, 2 Ambl. 651.)

"The twenty-one cases enumerated in the statute, and the others constructively within it, are of a public nature, tending to the benefit or relief, in some

shape or other, of the community at large." (*Babb v. Reed*, 5 Rawle, 151 [Pa.], 28 Am. Dec. 651.)

"The word 'charity,' in its *widest* sense, denotes all the good affections men ought to bear toward each other; in a more restricted sense, it means relief or alms to the poor; but in a court of chancery the signification of the word is derived from the statute of Elizabeth. Hence it has been said that those purposes are considered charitable which are enumerated in the statute, or which by analogy are deemed within its spirit or intendment." (2 Perry, Trusts, [3d ed.], § 697.)

The same author says that the statute "established an enumeration, or kind of definition, standard, or test, to which all gifts and grants in trust could be brought, in order to determine whether they were charitable." (§ 696.)

"By public must be understood such as are constituted for the benefit either of the public at large or some considerable portion of it answering a particular description." (1 Lewin, Trusts, 98. Text-book Series.)

Of necessity the purpose must be public, for the property becomes public property, to be dealt with as such. The following passages from the opinion of the supreme court of the United States in the Mormon Church case are instructive on this point:

"Though devoted to a particular use, it is considered as given to the public, and is, therefore, taken under the guardianship of the laws. . . . Property given to a charity becomes in a measure public property, only applicable as far as may be, it is true, to the specific purposes to which it is devoted, but within those limits consecrated to the public use, and become part of the public resources for promoting the happiness and well-being of the people of the state. Hence, when such property ceases to have any other owner, by the failure of the trustees, by forfeiture for

illegal application, or for any other cause, the owner-
ship naturally and necessarily falls upon the sovereign
power of the state ; and thereupon the court of chan-
cery, in the exercise of its ordinary jurisdiction, will
appoint a new trustee to take the place of the trustees
that have failed or that have been set aside, and will give
directions for the further management and adminis-
tration of the property ; or if the case is beyond the
ordinary jurisdiction of the court, the legislature may
interpose and make such disposition of the matter as
will accord with the purposes of justice and right.
The funds are not lost to the public as charity funds ;
they are not lost to the general objects or class of ob-
jects which they were intended to subserve or effect.
The state, by its legislature or its judiciary, interposes
to preserve them from dissipation and destruction, and
to set them up on a new basis of usefulness, directed
to lawful ends, coincident, as far as may be, with the
objects originally proposed. . . . 'In this country,
the legislature or government of the state, as *parens
patriæ*, has the right to enforce all charities of a public
nature, by virtue of its general superintending au-
thority over the public interests, where no other per-
son is entrusted with it.' But here, the legislature is
the *parens patriæ*, and, unless restrained by constitu-
tional limitations, possesses all the powers in this re-
gard which the sovereign possesses in England.''
(*Mormon Church v. United States*, 136 U. S. 1, 51, 56,
57, 59, 10 Sup. Ct. 792, 34 L. Ed. 478.)

As an illustration of the exercise of this power, a
few years ago the legislature of Pennsylvania enacted
a law that where public charities could not be carried
into effect, and no other disposition should be made by
the legislature, the property was to be sold and the
proceeds be covered into the treasury. (See *Trim's
Estate*, 168 Pa. St. 397, 31 Atl. 1071.)

We are not now concerned with the application of
the doctrine of *cy pres*, which was the matter princi-
pally under consideration in the Mormon Church case,

but with the determination of the public nature of a
charity by the application to it of the test of public
visitation and control.

If property devoted to public charity be endangered
or illy administered, the attorney-general, as such,
may proceed by information to protect the estate.
This is settled law in this country as in England.
Hence, if the trust be not of such nature as that the
attorney-general could bring an information, it cannot
be a public charity.   Under what circumstances, then,
can the attorney-general bring an information?   Only
where the matter is of *public* interest; only where the
entire people, *as the people*, are interested in the sub-
ject of the controversy.

"The fundamental ground on which the state is
permitted to sue in these cases is, that there has arisen
a public right, and of a nature which makes it the
duty of the state, through its law officer, to take ac-
tion for its maintenance and enforcement.   And the
proceeding before us necessarily assumes the existence
of a public right capable of being asserted and carried
out in the court of chancery, in a suit by the attorney-
general, wholly adverse to all private parties and all
private interests."   (*Attorney-general v. Soule*, 28 Mich.
153, 155.)

It was long ago settled in this state that the *public*
duty which the attorney-general may sue to enforce,
or the *public* wrong he may sue to prevent, must be a
duty or a wrong "affecting the whole community"
(*Bobbett v. The State, ex rel. Dresher*, 10 Kan. 14) ; "af-
fecting the community in general" (*The State, ex rel., v.
McLaughlin*, 15 Kan. 233, 22 Am. Rep. 264) ; a matter
affecting "the interests of the entire public" (*School
District v. Shadduck*, 25 Kan. 467).   See, also, *City of
Argentine v. The State, ex rel.*, 46 Kan. 430, 26 Pac. 751.
It follows that the charities which the attorney-gen-

eral can sue to enforce or conserve must be charities of a character so public as to interest "the whole community"—"the community in general"—"the entire public."

As the property becomes public property, which the legislature, limited by the charitable purpose, may deal with as such, and suits concerning it may be maintained by the attorney-general, which officer can maintain an action only where "the interests of the entire public" are affected, it is clear that a public charity is one of such character that it might be established by government itself and be supported by taxation, for what is a public purpose which may be aided or maintained by taxation but a purpose "affecting the community in general"? So, if we did not have the statute of Elizabeth as a guide, and if no definition had ever been authoritatively given, we must deduce from the incidents enumerated the definition of a public charity laid down in the cases already quoted. These incidents would compel us to define it as "a gift to a general public use"—a gift for an object which the state itself ought, or lawfully might, undertake and accomplish with public resources.

As said by the supreme court of the United States, "the law respecting property held for charitable uses of course depends upon the legislation and jurisprudence of the country in which the property is situated and the uses are carried out" (Mormon Church v. United States, supra); so that a gift which might be a valid public charity in England may not be so in the United States. England has no written constitution. Parliament is the nation in its organic capacity. When voting on a statute the lords and commons exercise the same sovereign power the people of this country would ex-

Troutman v. DeBoissiere.

ercise in voting on a new constitution. What parliament does is done in sovereign intendment by Great Britain, and no court can question the validity of the act. So, if parliament should choose to endow an institution exclusively for Masons, Odd Fellows, or Methodists, no power would exist to restrain the appropriation of the public funds. English courts may, therefore, declare that to be a public charity which could not be such under our written constitutions. The fourteenth amendment to the federal constitution forbids legislation in favor of artificial classes, and prevents the appropriation of public funds to other than strictly public uses.

If, then, a public charity is a gift to a public object which the state itself, with public resources, should, or lawfully might, foster, can the trust in question in this case be a public charity? The state can and should provide for the care of the orphans, but would a law be valid which provided for the establishment and maintenance of a home for the orphans of deceased Odd Fellows? It is the state's duty, as we assume, to provide for the children of the soldiers who fall in its battles, and hence, as we again assume, it may lawfully establish and maintain homes for their orphans; but could it lawfully establish at public expense a home for the orphans of deceased democratic or republican soldiers? Classification in the matter of public favor must be based on some obvious distinction having reference to the merits of the object to be attained. It must not be arbitrary or artificial. The class must stand in a natural and meritorious relation to the public at large. As said in the dissent filed to the decision of this case as formerly made:

"A charitable trust for the relief of disabled sea-

men, or railroad employees, or coal-miners, would doubtless be a valid public charity, because those persons perform necessary labors in the work of the world. Commerce could not be carried on without them, and in the prosecution of the enterprises with which they are connected they are subjected to daily hazards of disease and daily hazards of life and limb. As classes they stand therefore in such natural relations to society as to have claims upon it; hence, such charities as might be administered in their behalf and in recognition of their claims would be public charities. But a charity founded for the benefit of such seamen as belonged to the boatmen's union, or such railroad employees as belonged to the rail-roadmen's union, or such miners as belonged to the miners' union, would not be a public charity. It would be private, because it would be of private concern to the members of the union only. In *Board of School-land Commissioners v. Wadhams*, 11 L. R. A. 211 (25 Pac. 722,) it was said : 'The requisites of a valid private trust and one for a charitable use are materially different. In the former there must not only be a certain trustee who holds the legal title, but a certain specified *cestui que trust*, clearly identified or made capable of identification by the terms of the instrument creating the trust ; while it is an essential feature of the latter that the beneficiaries are uncertain, a class of persons described in some general language, often fluctuating, changing in their individual members, *and partaking of a quasi-public character.*' Authorities to the same effect might be multiplied. The beneficiaries of a valid public charity must therefore partake of a *quasi*-public character ; that is to say, the public must be under obligations to them as a class. As a class they must have some claim upon the public, such as the claim to nurture in infancy, to education in youth, to healing if diseased, to asylum if insane, to support if indigent, and that claim must be one founded in nature and cognizable by the instincts of a common humanity. It cannot be one growing out of, or existing in, the private conventions or class associations or artificial distinctions of men. The

public is under obligation to educate and provide homes for its orphans, not because they are the chil-dred of deceased Odd Fellows or Masons, or deceased Methodists or Presbyterians, or deceased republicans or democrats ; but because they are fatherless, and be-cause the public must therefore stand to them *in loco parentis*. Their orphanage involves them in a natural relation to society.. It clothes them with that public interest which demands the aid and protection of so-ciety ; but the obligations of society to them can be no wise augmented by the fact that they are the chil-dren of the deceased members of some particular cult, sect, or party, because charity, as the public is under obligation to administer it, knows no distinctions of creed, or sect, or party. It knows only the unfortu-nate, the needy, the worthy.''

Who, with the settled meaning of public charities before him, can fail to see the pertinency of this para-graph from the original majority opinion in *Burd Or-phan Asylum v. School District*, 90 Pa. St. 29, as the case was first decided ?

''A public use, whether for all men or a class, is one not confined to privileged persons. The smallest street is public, for all have an equal right to travel on it ; but a way used by thousands, which may be shut against a stranger, is private. Would Girard College be a public charity if the male children entitled to ad-mission were limited to sons of deceased Masons or Odd Fellows ? If Pennsylvania Hospital closed its gates to all but Methodists or Baptists having recent injuries, the people would not believe it a purely pub-lic charity in the intendment of their constitution. A charity for the poor of a parish or township is public ; but not, if confined to poor Presbyterians in the mu-nicipality. Public charities may be restricted to a class of the people of the state or of a municipal division ; at the same time, they must be general for all of the class, within the particular municipality. 'Thus, a blind asylum is only for the blind in the community.' If it be completely public, all the blind in that com-

munity are on an equal footing, and, should its capacity be insufficient for all, there is no mistaking justice in the order of admission.    To open its doors only to the blind of a particular religious denomination, or of a beneficial association, or of a political party, shuts them against the public.    A known and recognized class, though not generally poor, or diseased, or decrepit, may be the subject of a public charity, as sailors ; yet, if the endowment were limited in its benefits to sailors who are members of a designated sect, there could hardly be two opinions of its character.''

But it is contended that, inasmuch as it is the duty of the state to provide for the nurture and instruction of orphans, the children of deceased Odd Fellows are of the class thus to be cared for, and that a trust providing for them in such respects relieves the public burden *pro tanto;* hence, that the trust in this case is in ease of the public, and is, therefore, within the definition.    If this contention were tenable, then a bequest for the support of the future destitute descendants of the grantor, DeBoissiere, would be a public charity, for his destitute descendants would be of the class which the state should relieve, and, to the extent of his bequest, the public burden would be eased.    A bequest of this precise character came before the supreme judicial court of Massachusetts for consideration in *Kent v. Dunham*, 142 Mass. 216, 7 N. E. 730, 56 Am. Rep. 667, and the very point thus suggested was made.    Certain property was given to trustees with instructions '' to appropriate such part of the principal and interest as they may deem best for the aid and support of those of my children and their descendants who may be destitute, and in the opinion of said trustees need such aid.''    The court thus stated the question :

''The gift in the case at bar is solely for the benefit of the children of the testator and their descendants.

The only public interest there can be in connection with it is, that, whereas there may be hereafter certain destitute persons, descendants of the testator, who might otherwise become a public charge, they will be entitled to relief from this fund.''

The decision, of course, was that the trust was not a public charity.   The very contention made here was forcibly answered in *Phila.*, *Appellant*, *v. Masonic Home*, 160 Pa. St. 572, 579, 28 Atl. 954, 23 L. R. A. 545, 40 Am. St. Rep. 736:

''Nor does the argument that, to the extent it benefits Masons, it necessarily relieves the public burden, affect the question ; there is no public burden for the relief of aged and indigent Masons ; there is the public burden of caring for and relieving aged and indigent men, whether they be Masons or anti-Masons ; but age and indigence concern the public no further than the fact of them ; it makes no inquiry into the social relations of the subjects of them.   The public is interested in the relief of its members, because they are men, women, and children, not because they are Masons.''

It would serve no good purpose to con over the many cases which have considered phases of the general subject of trusts for charitable uses.   It is admitted that some of them are, apparently at least, in opposition to the view herein expressed.   It is submitted, however, that in many instances the judges were influenced by their natural and creditable desire to preserve the gift to the beneficent uses intended by the donor, and this, also, is our desire.   We would like to preserve the DeBoissiere gift to the orphans for whom it was apparently intended, but in order to do so we would have to hold, within the inevitable logic of the decision made, that it is in the power of an individual, by the making of such gift to a private, special, and artificially existing class, to limit his

bounty to them, and to them alone, for all time to come; to exempt it from taxation for all time to come; to impose upon the public the obligation for its care and superintendence for all time to come; and, if need be, for all time to come to lay upon the public the duty of its maintenance and support. That, we hold, cannot be done. There is as much ground for upholding such gifts in trust to the use of the orphans of deceased republicans or democrats, or deceased Methodists or Baptists, and, under the pretense of their being public charities, perpetuating them among the moral and political obligations of the state to those special classes, as there is for upholding a perpetual gift in trust to the use of the orphans of deceased members of a fraternal society. Absolutely no distinction can be drawn between such cases. That is not a public charity which the state is not under obligation in the first instance to endow for the use of the very class to be benefited; and the state is not under obligation to provide and maintain a home for the orphans of deceased Odd Fellows.

The rule against perpetuities was one of the wisest inventions of the common law. It was devised to prevent the perpetual entailment of estates and to give them over to free conveyance. Were it not for that rule it would be within the power of a land proprietor to decree the ownership of his estate to the remotest generation. That rule should not be relaxed except in the interest of the general public, and, as a practical fact, it is not relaxed except where the public itself holds the title and is the trustee, or, if not holding the title and acting as the trustee, possesses an admitted right of visitation and control. That right of visitation and control it cannot exercise except in behalf of the entire body politic, and the body politic has not

the right of visitation to a privately endowed home for the orphans of deceased members of a secret fraternity.

The courts of Pennsylvania have made many decisions bearing more or less directly on the question here involved.   They are not all reconcilable one with another, and the judges do not pretend that they are. One of the most recent, if not the latest, was made in *Phila., Appellant, v. Masonic Home*, supra, an extract from the majority opinion being hereinbefore quoted.   That decision is bottomed upon the true ground—the artificiality of the class to whose use the trust was made, and the non-obligation of the public to such class, as a class.

Our dissenting associates, however, observe a distinction in two particulars between that case and this one.   The first is that the claim in that case was one of exemption from taxation, and was therefore to be viewed critically, and allowed only upon a clear showing of right.   It is undeniable that claims of exemption from the common and necessary burdens of citizenship, such as taxation, are to be rejected unless enforced by the strict letter of the law.   The court, however, did not draw that rule to its aid in the determination of the case, for the very good reason that it could not do so without neutralizing or disallowing another rule of construction and, also, of legal policy, to wit, that ''the courts look with especial favor upon grants to charity, and endeavor to carry them into effect if the same can be done consistently with the rules of law.''   Had the claim of exemption in that case been as a matter of gratuitous favor, apart from all considerations of merit as a basis for making it, there would have been room to apply the rule of strict construction spoken of, but the claim was not rested

upon that ground, but upon the broader one that a home for indigent Free Masons was a public charity. Rested as it was upon that ground, the question involved a consideration of the nature of public and private charities, and the claim of public charity was therefore disallowed.

Another distinction which our associates observe between the Pennsylvania case and the one before us, as stated by them, is that in that case the public nature of the charity was denied because its beneficiaries became such upon voluntary, rather than by their involuntary, action ; and it is gravely urged that inasmuch as the objects of the DeBoissiere charity did not choose to be born the children of Odd Fellows, but became such by fortuitous circumstance over which they had no control, they as a class are entitled, and without violence to the rule of the Pennsylvania case, to be regarded as the objects of a public charity. The *rationale* of the Pennsylvania case does not justify the imputation of such a fine distinction.  The decision of that case is put upon the broad ground of the artificiality and private character of the class claiming the benefits of the charity, as opposed to the naturalness and public character of the class to whom society is under the obligations of charity.

Nor can any such distinction exist as the one which our associates endeavor to draw when they hold that those who voluntarily connect themselves in a private relationship may not be, by virtue of such relationship, the recipients of public charity, while on the other hand their orphan children may be.   Let us see :  A gift in trust to the use of A. and B., husband and wife, is not a public charity, because their association is voluntary, and the public is no more concerned to care for A. and B. than for other husbands

and wives; but a gift to the orphans lineally descended from A. and B. is a public charity, because such orphans did not voluntarily become such, nor voluntarily become the descendants. of A. and B. Take another illustration : Any one of our brethren may make a trust conveyance for the benefit of his female orphaned descendants ; more than that, for those of them who bear his name ; more than that, for those who bear the Christian name of his wife. Now, because none of them voluntarily descended from him nor voluntarily became an orphan, his conveyance is a gift to a public charity, and without the rule against perpetuities.   Thus does such logic at once reduce the proposition to an absurdity.

Lament is made that the decision we announce may deter the charitably disposed from those benefactions to the unfortunate and needy which they would be otherwise disposed to make.   Not so, in our judgment. Among the millions which the benevolently inclined of this country have contributed to the teaching or healing or care or cure of others, we venture to say not a tithe even—only an inconsiderable fraction— has been donated to class favorites, and none of it in a spirit of class favoritism ,  Where donations to an artificial class have been m ide, as in the DeBoissiere gift, they would have been 'made as readily to objects of general beneficence had the donors known the requirements of the law.   To suppose that DeBoissiere would not have disposed of his estate to the use of some objects of worth or need, because he could not limit his gift within the narrow circle of a secret society, is a reflection upon the memory of that kindly and benignant old gentleman we are not disposed to make. Charity is not exclusive, and draws no distinction of class or caste.

The plaintiffs in this case claim title by conveyance from the sole heir of DeBoissiere, the grantor before mentioned. The defense of the defendants is solely on the assumed title conveyed by the trust instrument hereinbefore quoted. It follows that, such instrument being void, the plaintiffs are entitled to prevail.

It is therefore ordered that the judgment of the court below be reversed, and that the plaintiffs have judgment as prayed for by them.

JOHNSTON, SMITH, GREENE, JJ., concurring.

CUNNINGHAM, J. (dissenting) : The deed in question is not obnoxious to the rule against perpetuities, because, first, the rule is not what the majority assume it to be, one against the perpetual vesting of title, but rather one against the unlawful or unreasonable postponement of the vesting of title ; and, second, if the rule against perpetuities were such as the majority assume it to be, the deed in question would not violate it because it conveys an absolute estate in fee simple, without limitation or condition serving to prevent alienation at any time.

The majority of the court base their opinion on an assumption. If that assumption be a false one, of necessity the conclusion is incorrect. That assumption is : "The foregoing deed is void on its face  .  .  . for it violates the rule against perpetuities of title in estates." Not one syllable of argument is found to sustain this conclusion. I think it is wholly unwarranted and has no basis in the law.

What is a perpetuity ? We are given no light on this question in the opinion, except that, in the latter part of it, it is said : "The rule against perpetuities was one of the wisest inventions of the common law. It was devised to prevent the perpetual entailment of

estates and to give them over to free conveyance.''
This definition goes very wide of the mark, as I will
show.    Many of the states of the union have enacted
statutes defining for themselves, and defining differ-
ently from one another, the rule against perpetuities.
In Kansas no statute whatever has been enacted upon
the subject, so that whatever rule prevails here comes
to us from the common law, as it must be granted
that, under section 8014 of the General Statutes of
1901, ''the common law as modified by constitutional
and statutory law, judicial decisions, and the con-
ditions and wants of the people, shall remain in force
in aid of the general statutes of this state.''    The
rule against perpetuities as found in the common law,
then, is the law of this case.    At common law this
rule, however, is not one against the right of aliena-
tion of title, or ''the perpetual entailment of estates,''
but one against the suspension of the vesting of title
for a length of time obnoxious to the rule, usually
spoken of as ''during lives in being and twenty-one
years and nine months thereafter.''    It is not a rule
against the perpetual vesting of title, but against the
indefinite or illegal suspension of the vesting of title
—a rule, for example, that forbade one from convey-
ing a life-estate to his son, with a life-estate to his
grandson not then living, and the fee over to his great-
grandson.    The rule grew up gradually—is a court-
made rule.    It grew out of the commercial necessity
of having the title to realty vested somewhere within
a reasonable time.    On the other hand, the ''per-
petual entailment of estates'' was a favorite of the
common law, supporting, as it did, the right of
primogeniture and growing out of the feudal system.

Let us look at the authorities.    I quote largely from

Professor Gray's very learned work on Rule against
Perpetuities :

"The rule against perpetuities is often spoken of as
aimed at restraints upon alienation. . . . The
misconception has been aided by the name given to
the rule. It would have been better had it been called
the rule against remoteness. But usage has settled
the name as the rule against perpetuities." (§2.)

"The practice of confounding the rule against re-
moteness with the rules disallowing restraints on
alienation has led to grave practical errors." (§3.)

"But before considering its development, a per-
petuity itself should be defined. The ambiguity of
terms, which is such a prolific source of confusion in
the law, is present here. The natural, the original,
meaning of a perpetuity is 'an inalienable, indestructi-
ble interest.' The second, artificial, meaning is, 'an
interest which will not vest till a remote period.' This
latter is the meaning which is attached to the term
when the rules against perpetuities is spoken of. As
has been said, §2, *ante*, it is to be regretted that the
rule has not become known as the rule against remote-
ness. More than one erroneous decision would prob-
ably have been then escaped. The natural meaning
of the word 'perpetuity' as an inalienable, indestruc-
tible estate, is the sense in which we find it first used
in the law. Thus a condition not to suffer a recovery
of an estate-tail was declared to be bad as tending to
create a perpetuity." (§140.)

"The true form of the rule against perpetuities is
believed to be this : No interest subject to a condition
precedent is good, unless the condition must be ful-
filled, if at all, within twenty-one years after some
life in being at the creation of the interest." (§201.)

"But in the rule against perpetuities the term has
not this original, natural meaning, but a secondary,
artificial one. A perpetuity in this secondary sense
means 'an interest which will not vest till a remote
period.' The rule against perpetuities is not directed
to preventing the alienation of present interests, but
against the creation of remote future interests. Now

while it is true that the nature of charitable trusts makes them inalienable, and therefore perpetuities, in the natural sense of that term, it is by no means a necessary incident of charitable trusts that they should be allowed to begin in the remote future ; or, in other words, that they should be exempt from the operation of the rule against perpetuities.   The law may have exempted them, but such exemption is not involved in the conception of a charity.''   ( § 591.)

''The prevention of property from inalienability is simply an incident of the rule against perpetuities, not its object.   The true object of the rule is to restrain the creation of future conditional interest.'' ( § 600.)

In the American and English Encyclopedia of Law, volume 22, second edition, page 703, the rule is thus defined :

''The rule against perpetuities has nothing whatever to do with the alienability of property, but concerns itself solely with the vesting of future interests therein within a certain prescribed period.''

In Pennsylvania the common-law rule as to perpetuities had not been interfered with by statute, and it was there held in *City of Philadelphia v. Girard's Heirs*, 45 Pa. St. 9, 84 Am. Dec. 470, at pages 26 and 27 :

''Perpetuities are grants of property, wherein the vesting of an estate or interest is unlawfully postponed.   Saunders on Uses and Trusts, 196.''

''The law allows the vesting of an estate or interest, or the power of alienation, to be postponed, and the accumulation of its increase to be made previous to vesting, for the period of lives in being, and twenty-one years and nine months thereafter, and all restraints upon the vesting, that may suspend it beyond that period, are treated as perpetual restraints, and therefore as void, and consequently the estates or interests dependent upon them are void ; and nothing is

denounced by the law as a perpetuity that does not transgress this rule.''

This case was followed and the same rule announced in *Yard's Appeal*, 64 Pa. St. 95.

The common-law rule against perpetuities is thus shown to be not a rule in restraint of alienation, but a rule forbidding the indefinite postponement of the vesting of title. Incidentally this rule may operate to remove restrictions on the immediate conveyance of property. However, the true object of the rule is to prevent the creation of interests upon remote contingencies, and this not because of the inalienable quality of a remote contingency, but because of its uncertain value.

Some courts have been misled in the application of the rule against perpetuities because of a misconception of the meaning of the word as used in the rule, and it seems that such is the condition of the majority of the court in this case. I am aware that the term ''perpetuities'' is used in its popular and natural sense in most, and, perhaps, all, of the statutes enacted upon the subject in this country, but these statutes cut no figure with us.

· Now, in the light of the true meaning of the rule against perpetuities, how does it fare with the conveyance in this case, if we grant that the object named therein is not a charity? The granting clause is ''to have and to hold the same, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, forever, *in fee*.'' Wherein is there a postponing of the vesting of this title? Upon what contingency or condition does the immediate vesting of the title, the entire title, the fee-simple title, depend? Upon the delivery of the deed, these trustees were the sole, un-

conditional owners of the land.   The vesting of no part of the title was postponed or conditioned.   To be sure, the use of this entire title was directed, but the immediate vesting of the title itself was not limited nor even its alienation restrained.   That the grant was to trustees makes no difference when the grant was of the entire interest, to vest immediately and unconditionally.

A well-known rule of construction requires us, if there is a doubt as to the character of the deed, to resolve it in favor of the conveyance so as to hold it valid and not void, and unless its language absolutely forbids such a construction, we should so hold it.   A grantor is supposed to intend a legal result.   A grantee is entitled to hold what he has received.   (*Dean v. Mumford*, 102 Mich. 510, 61 N. W. 7.)

Again, as has been hereinbefore suggested, even under the mistaken view of the majority as to the meaning of the rule against perpetuities, the conveyance in question is perfectly good.   It conveys to the gentlemen named the title to the premises *in fee*.   A fee in land is the entire title, the absolute title, the largest possible estate.   No words of inheritance, succession or power of disposal need to be added.   This term implies them all.   More than this, the *habendum* clause carries this title so granted to "their heirs and assigns."   It would insult the intelligence of the veriest tyro in the law to cite authorities to prove that the words of the granting and *habendum* clauses in the deed in question are sufficient to convey a full fee-simple title, which means everything that can be said for a title in lands.   These words are used daily to accomplish this purpose.   This deed will be searched in vain for any word or phrase necessarily restraining the right of disposition for one moment, not to say

perpetually. Every condition found in the deed is entirely consonant with the right, if, indeed, they do not contemplate the sale of portions, at least, of the premises granted. If this be not so, they at most are but conditions subsequent and do not in the least serve to limit the fee already granted.

"If the act or condition required do not necessarily precede the vesting of the estate, but may accompany or follow it, and if the act may as well be done after as before the vesting of the estate ; or if, from the nature of the act to be performed, and the time required for its performance, it is evidently the intention of the parties that the estate shall vest, and the grantee perform the act, after taking possession, then the condition is subsequent." (Tied., Real Prop. § 273.)

"It is a rule of law and equity, that where a vested estate is distinctly given, and there are annexed to it conditions, limitations, powers, trusts (including trusts for accumulation) or other restraints relative to its use, management, or disposal, that are not allowed by law, it is these restraints, and the estates limited on them, that are void, and not the principal or vested estate." (*City of Philadelphia v. Girard's Heirs*, 45 Pa. St. 9, 84 Am. Dec. 475, citing a large number of cases in support thereof.)

Not one of the conditions of this deed are conditions upon which the title in *fee simple* shall vest in the trustees. The most that can be said is that they are directions as to the management of the estate after the vesting of title, and, being, at most, conditions subsequent to the granting of this estate absolute, with consequent power of alienation, they do not serve to limit such power. It is a well-established rule that the courts view with great jealousy an attempt to defeat by an attached condition an estate clearly granted, and only do so when there is no reconciliation possible. (*Ernest v. Shinkle*, 95 Ky. 608, 26 S. W. 813 ; *Saxton and hus-*

*band v. Webber and others*, 83 Wis. 617, 53 N. W. 905, 20 L. R. A. 509; *Combs v. Combs et al.*, 67 Md. 11, 8 Atl. 757, 1 Am. St. Rep. 359; *Daniels v. Eldridge*, 125 Mass. 356; *Stansbury v. Hubner et al.*, 73 Md. 228, 20 Atl. 904, 11 L. R. A. 204, 25 Am. St. Rep. 584.) Further, a condition, in order to defeat or limit such an estate, must not only be definite and certain, but legal, and a condition subsequent, not legal, will be disregarded. So here, if any of the conditions in this deed can be construed to limit the fee therein granted, which seems to be impossible, and such condition raises the restraint upon alienation which the chief justice thinks is vicious, under the rule against perpetuities, then such condition is illegal and must be disregarded. It has even been held that the courts, in order to sustain a conveyance, will disregard a condition repugnant to the rule against perpetuities. (*Edgerly v. Barker*, 66 N. H. 434, 31 Atl. 900, 28 L. R. A. 328.)

Let me illustrate the operation of the rule as laid down in the majority opinion. Probably the title to every piece of property devoted to church uses or the use of denominational schools in Kansas is held by trustees in trust for an indeterminate number and *personnel* of those loosely known as members of the congregation, or patrons of schools. Such title is so to be held forever—a perpetuity, as defined by our brethren. Now, a church or a denominational school is not a charity, under the argument of the majority, because it is not subject to public visitation, nor can a public tax be levied for its support; therefore, every such title is liable to forfeiture to its grantee under the rule against perpetuities, as laid down in this opinion.

The deed in the case at bar is not obnoxious to the rule against perpetuities in the common-law definition

of that rule—that being the only definition open to us—because the title thereby conveyed vests presently and is not postponed. Nor would it be obnoxious to that rule were it what the majority mistakenly suppose it to be, for it conveys an absolute title in fee simple with power of inheritance and disposal, as it warrants the title in the "heirs and assigns" of the grantees, and this title is nowise limited or restrained by the conditions precedent or subsequent in the deed.

Again, the purpose of this trust is a charity and, as such, is removed from the operation of the rule against perpetuities. This is so conclusively shown by logic and precedent in the dissenting opinion of Mr. Justice Pollock that there is no need of extended comment by me. I will suggest, however, that no reason exists for the emphasis laid upon the word "public" in this connection. A charity is a charity, and a charity is entitled to exemption from the forfeiture denounced by the rule. The word "public" adds nothing, and it only comes into the discussion from some cases considering the question as to the right of exemption from taxation under constitutions or statutes exempting "public charities."

The reason why charities are relieved from the forfeiture declared by the rule in question is clearly stated by Professor Gray, in section 595, *supra*, which is as follows :

"That rule concerns itself with the beginning, not with the end of estates. There is therefore no harm in the equitable estate of the individual ending at a remote period. There is no change in the legal estate, and the only matter which can be thought obnoxious to the rule against perpetuities is that the charitable trust begins at a remote period. But under the charitable trust no one has any rights, and as the purpose of the rule against perpetuities is to prevent the crea-

tion of remote rights, it might be argued that the rule has no application.''

The argument of the majority stands upon two propositions : (1) A charity must be inclusive as to all classes within a definite territory ; (2) in order to be a charity such as not to be obnoxious to the rule, the right of public visitation and public taxation in aid of the same must exist.   Neither of these tests is sound.   It is agreed that a segregation limited by territory is good ; that a gift to the orphans of a given city, ward, precinct or school district would be a charity, because a multiplication of these divisions would finally include the entire state.   Now, would not the same reasoning make a gift to the orphans of deceased Odd Fellows, or Masons, or Methodists, or Baptists, or of persons belonging to no society or church, equally a good charity ?   A multiplication of classes would become wholly inclusive ; that is, the entire needy could be as easily included by restriction to classes as by restriction to territory.   Clearly the charitably inclined would be more certainly moved to those of a class in which they were especially interested, as in the present instance, than to those of a given territory indiscriminately.   I cannot appreciate the logic which would include one and exclude the other.

The taxation theory deserves praise for its novelty, at least, for it is certainly new.   Its application would make void all gifts to churches, missionary societies, Bible societies, sectarian colleges, temperance societies, and many other objects which are now recognized everywhere as charitable.   None of these is subject to public visitation or could be the beneficiary of a public tax.

Through all the books is found the suggestion that

the promotion of charity should be encouraged; that courts will resolve all reasonable doubts to that end. Indeed, such is the prompting of the spirit of this age, that a broadening of our love for our fellow men and pity for the sorrows of needy and dependent ones, so universally growing, goes far to soften and temper the increasing tide of commercialism. The courts ought rather to encourage the growth of these laudable purposes than to exercise their ingenuity in inventing new limitations thereon. There is enough in the old rules of the law to defeat the charitable purposes of the unwary and ill informed without inventing new ones. The judicial defeat of these purposes has not infrequently brought the courts into disrepute. The language of Mr. Justice Marshall in *Harrington and others v. Pier and others,* 105 Wis. 485, 490, 82 N. W. 345, 50 L. R. A. 307, 76 Am. St. 927, fitly reprobates such a course:

"Few things occur in the administration of justice more lamentable than the occasional strangling of some wise and noble purpose to devote the savings, or a part of them, of a life of industry, to the upbuilding of the human race at some point or in some field, and the diversion of what was intended for some public benefit to private use, directly contrary to the will of him whose last days were solaced with the thought that his public benefactions would build an enduring monument to his memory in the hearts of grateful people, and the hope of eternal rewards for such well-doing believed to be waiting for bestowal."

I find no case in the books, nor can conceive of one, where a purpose to establish a noble charity has been more ruthlessly wrenched aside than in the one at bar. The story is pathetic, if not tragic. Mr. DeBoissiere was a native of France. Inspired by a broad charity and love of his kind, he had entertained the purpose

to devote considerable of his property to the softening of the condition of various classes and needy ones. Just what direction this desire was to take when he acquired the property in question does not appear, but it does appear that for several years he had been looking around for a worthy object upon which to bestow his estate, and to place it in such shape that it would be safely managed and prove of great and permanent value to the needy.   After long consideration and many conferences with the charitably inclined, he selected the particular object indicated in his deed and conveyed the estate, the value of which is approximately one hundred thousand dollars, to the gentlemen named, with certain general directions as to his views of the manner in which his noble object was to be carried out.   Satisfied with this arrangement, he went back to France and soon thereafter died.   The plaintiffs in error, for little more than a nominal consideration, recei⌐ a from Mr. DeBoissiere's sister, and only heir, a quitclaim deed to the property in question, and they are enabled by this decision to divert this noble provision for a needy and deserving class from the purpose of its donor.   If this sad result were the necessar, consequence of the application of well-recognized rules of law, no one should complain, but, in view of the fact that new theories are invented and an unwarranted and unsupported application of rules is made to accomplish it, ample ground for this dissent exists.   In my opinion, the result arrived at finds warrant in no fact or consideration in the case.

PolLock, J. (dissenting) :  By reference to the conveyance declared void in this case, it will be found to be in perfect legal form, in express terms, to convey the property in dispute to the grantees therein men-

tioned, their heirs and assigns forever, in fee, as trustees, for the benefit of the orphan children of deceased Odd Fellows of the state. The action, in its present form, is to set aside this conveyance on the ground of fraud. No fraud was found by the trial court. It is declared void for reasons purely legal. The action is one of purely equitable cognizance, governed and controlled by equitable principles. That which is right and just in the premises between man and man alone appeals to the conscience and binds the judgment of the court. In such case it is always proper to take a retrospective view of the attitude of the parties before the court, and their relation to, and dealings with, the subject-matter of the controversy, for in these often lie the equities of the case, and it is a rule of universal application that he who invokes the aid of a court of equity must come with clean hands.

What is the attitude of the defendants in the litigation ? They represent the helpless orphans of a large class of society in this state. Their grantor, from an abundance of wealth, out of a large heart, moved by a spirit of generosity and benevolence, conceived the plan of conferring upon these helpless orphans the blessings of a larger education and better equipment for life than they could otherwise obtain. It is a commendable fact that in courts of all Christian nations such litigants have been the favorites of the law, even to the extent that a rule of decision has grown up that such grants must be upheld, if possible, consistently with the principles of the law.

On the other hand, what is the attitude of the plaintiffs ? As shown by the record, their first appearance in this controversy was as counsel for the sister of the grantor, as his heir at law, in an action of ejectment brought to recover this property. She

Troutman v. DeBoissiere.

resided in France. She had no right to recover the property, because she was an alien and could not inherit under existing law. The property is large, estimated to be of the value of $75,000 to $100,000. According to plaintiffs' showing, while acting in the fiduciary relation to her of legal adviser, and at a time when, in the absence of an authorizing treaty between this government and France, she possessed no inheritable or salable right to the property, they engaged in the doubtful transaction of securing from her a transfer of her pretended interest in the litigation for the nominal sum of about $4500. In other words, upon their own showing, they are guilty of wagering with their client, at the ratio of about twenty to one, that the courts of this state would not uphold the deed of her brother, as grantor, to a worthy charity. They came into a court of equity to recover their wager, and have won. When *nisi prius* courts mistake the law there is a remedy for the correction of errors. When courts supreme, not alone in name or in power, but supreme in the dignity and majesty of the law, forget, ignore, or refuse to be guided by the well-established and fundamental principles of the law, there is no remedy for the correction of errors; but when the issue is one of large public importance, involving the welfare of a state, as in the case at bar, it becomes necessary to inquire by what authority is such decision made; by what process of reasoning is such conclusion reached; what logic employed to convince the mind, or what sophistry used to deceive, that the decision reached may be commended by the bench and bar of this and other states, if sound, or condemned if unsound.

In considering this question I shall lay aside any discussion of the rule against perpetuities discussed

3—66 KAN.

by Mr. Justice Cunningham in his dissenting opinion, for all agree that if the deed is a valid grant to a public charity the rule has no application. I also lay aside from this discussion the patent fact that as the conveyance is to the grantees, their heirs and assigns, in fee, as trustees for the orphan children of deceased Odd Fellows of the state, and contains no clause in restraint of alienation, the trustees take an alienable title. (*Boyer v. Sims*, 61 Kan. 593, 60 Pac. 309; *Webb v. Rockefeller*, post, just decided, 71 Pac. 283.) I prefer to place my dissent upon the ground that the conveyance is a valid grant to a public charity and must be upheld.

The ground of the decision of the majority, stripped of all useless verbiage, is summarized in the majority opinion as follows:

"That is not a public charity which the state is not under obligation in the first instance to endow for the use of the very class to be benefited; and the state is not under obligation to provide and maintain a home for the orphans of deceased Odd Fellows."

Without fear of successful contradiction, I deny the soundness of this statement. Its sole merit lies in novelty. No authorities are cited in its support, and I assert that there is not an authority to be found, ancient or modern, in all the vast accumulation of knowledge upon this subject, which either supports, or tends to support, this doctrine or the labored apology of the learned chief justice, written in excuse of the decision made.

The precise question has many times received the consideration of able courts in this country. These cases, however, are not referred to in the majority opinion; they arrived at a different conclusion. In the case of *Benjamin Franklin's Administratrix v. The*

*City of Philadelphia et al.*, 2 Pa. Dist. Rep. 435, it was held :

"It is not necessary that a charity should be open to every one in the community. A man may select classes, and when a class is designated, the charity is public."

In the opinion, Mr. Justice Arnold said :

"Nor is it necessary that a charity should be open to every one in the community. A man has a right to select classes of the people as the objects of his charity, and when he designates the class, the charity is considered public, although only those persons who come within the definition of the class are entitled to the benefit of it." (*Burd Orphans' Asylum v. The School District of Upper Darby*, 90 Pa. 21 ; *Philadelphia v. Women's Christian Association*, 125 Pa. 572, 17 Atl. 475 ; *Episcopal Academy v. Philadelphia,* 150 Pa. 565, 25 Atl. 55.)

"Stephen Girard's great estate, which now houses, feeds, clothes and educates 1500 orphan boys, would, if any strained definition of the word 'public' were allowed to prevail, be crippled by taxation ; yet only a class, and that a small class, of the people can obtain the benefit of it. Girls are excluded ; boys whose fathers are living are excluded ; men and women are excluded ; in short, all but 'poor, white male orphans' are excluded. Nevertheless, it is a great charity, and withstood numerous and persistent attacks in the courts of Pennsylvania and of the United States, until now it is fixed, firm and immovable as a rock. (*Vidal v. Girard's Executors*, 2 How. [U. S.] 127, 11 L. Ed. 205 ; *Philadelphia v. Girard's Heirs*, 45 Pa. 9, 84 Am. Dec. 470 ; *Girard v. Philadelphia*, 7 Wall. 1, 19 L. Ed. 53.)

"The essential part of the definition of a charity is that the persons who are to receive it must be indefinite and uncertain ; in other words, they must be of a class ; for if a gift be made to individuals by name or description, so that they may be selected and set apart, although they are of a class, the gift is not a

charity but a legacy. We have charities for Metho-
dist, Baptist, Presbyterian and Episcopal ministers,
charities for foreign missions, for schoolhouses, fire
companies, planting shade-trees, hospitals, churches,
students, priests, relief of the Indians, libraries, Free
Masons, Odd Fellows, aged couples, old men, widows,
soldiers, mechanics, merchants, actors, newsboys, and
others.''

In *City of Indianapolis v. The Grand Master, etc., of
the Grand Lodge of Indiana*, 25 Ind. 518, it was held :

"That an institution limits its benefactions to the
membership of a particular religious or secular organi-
zation does not deprive it of the character of a chari-
table institution."

Chief Justice Frazier, in delivering the opinion,
said :

"The third paragraph of the answer presents the
question whether that is a charitable institution, in
the sense of the statute, which confines its benefac-
tions to those who have become members of the
Masonic order, having paid the fees commonly re-
quired for that purpose. We think that this question
must be answered in the affirmative. It is not essen-
tial to charity that it shall be universal. That an in-
stitution limits the dispensation of its blessings to one
sex, or to the inhabitants of a particular city or dis-
trict, or to the membership of a particular religious
or secular organization, does not, we think, deprive
it either in legal or popular apprehension of the char-
acter of a charitable institution. If that only be
charity which relieves human want, without discrimi-
nating among those who need relief, then indeed it is
a rarer virtue than has been supposed. And if one
organization may confine itself to a sex, or church, or
city, why not to a given confraternity? So narrow a
definition of charity as the third paragraph presup-
poses is not, that we are aware of, ever attached to
it, and we are not at liberty to circumscribe the effect
of the statute, and defeat its intention, by affixing to
its terms an unusually limited meaning."

In the *City of Petersburg v. Petersburg Ben. Ass'n*, 78 Va. 431, it was held :

" Where the revenues of an association are applied wholly to paying its current expenses, the assistance of its indigent members, and the families of such as have died in need, these are charitable purposes, and it is not essential that they shall be universal."

In the opinion it was said :

"The objects of the association, which was incorporated by the legislature in 1826, are set forth in its constitution and by-laws, and in the preamble thereto, which declares that in instituting a society of mechanics, charity should be the principal but not the only object. Its revenues, as the testimony shows, are wholly applied to the payment of its current expenses, the assistance of its indigent members, and the families of such of them as may have died in needy circumstances. These are charitable purposes, and the relief afforded is none the less charity because confined to members of the association and the families of deceased members. It is not essential to charity that it shall be universal."

In the case of *Mason v. Perry*, 48 Atl. 671, the supreme court of Rhode Island held :

"A will bequeathed property to an incorporated Masonic lodge, and its successors forever, in trust, the income to be applied annually 'for the relief of needy members of such lodge, or preferably for the general purposes of the lodge, including now and then, if desired, an appropriation for proper forms of entertainment for the members.' *Held*, that though the first object was a charitable one, for which a charitable trust would be valid, the second object, for which the testator expresses his preference, was not charitable, and hence the bequest was void." (22 R. I. 474.)

In the opinion it was said :

"Assuming, then, as we will, that if the trust is valid it is such a one as the said lodge is competent

to take and administer, we will proceed at once to consider whether it is a valid charitable trust. The income of the trust property is to be expended annually 'for the relief of needy members of said Mount Vernon lodge, or preferably for the general purposes of the lodge; including now and then, if desired, an appropriation for proper forms of entertainment for members of the lodge.' That the first object thus specified is a charitable one will hardly admit of doubt; and had the testator stopped there, or had he fixed the amount to be thus used, we see no reason why such trust would not have been a valid and enforceable one. It would clearly have been one of the classes of trusts which are under the special control of a court of equity."

In *Price v. Maxwell*, 28 Pa. St. 23, it was held:

"A devise to a school under the auspices and control of a religious denomination or sect, and confined to the youth of its members both rich and poor, and in which the peculiar views of Christianity as entertained by that denomination constituted a part of the instruction imparted in the school, is a devise to a *charitable use.*"

In the opinion, after citing numerous cases, it was said:

"But in none of these cases was it supposed for a moment that the gift failed or ceased to be for charitable uses either, because not restricted to the poor, or because confined in its benefits to a particular class, or because it was for the spread of religion, or because it combined all or any of these purposes together."

In *Ould v. Washington Hospital for Foundlings*, 95 U. S. 303, 311, 24 L. Ed. 450, Mr. Justice Swain said:

"A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man. Perry on Trusts, § 687."

In *Estate of Willey*, 128 Cal. 1, 12, 56 Pac. 550, it was held :

"Devises in trust to trustees, for the use of the 'widows' and orphans' fund' of certain associations, are valid charitable trusts, notwithstanding such associations are not themselves charitable bodies, since it is not necessary that the trustee of such a trust should be a charitable institution, and it will be presumed, to support the trust, that such trustee will properly apply the funds.

"A bequest intended as a charity is not void, and will not be legally construed void, if it can possibly be made good."

In the opinion it was said :

"It is contended by respondents that the provisions for the payment of certain sums to Corinthian lodge, Washington chapter, and Marysville commandery— all being Masonic bodies—are invalid, because they are not charitable bodies, and because they are not bound to use the bequests for charitable purposes. But, in the first place, it is not necessary to determine whether a Masonic body is or is not a charitable institution, for it is not necessary that a trustee for charitable purposes should be itself a charitable institution ; it is sufficient if the bequest be for a charitable purpose. In each of the instances the bequest is made to the Masonic body 'for the use of the widows' and orphans' fund of said lodge,' or chapter, or commandery. This is a compliance with the legal essence of a valid charity—that is, that it is public, and is vague and uncertain as to the individuals to be benefited or relieved."

In *Heiskell v. Chickasaw Lodge*, 87 Tenn. 668, 11 S. W. 825, 4 L. R. A. 699, it was held :

"A devise to Chickasaw lodge of Odd Fellows, 'for the benefit of the widows and orphans,' is for the widows and orphans of deceased members of that lodge, and is sufficiently definite to be sustained as a charity."

Judge Story, in his work on Equity Jurisprudence, § 1177, says:

"The general rule is, that if lands are given to a corporation for any charitable uses which the donor contemplates to last forever, the heir never can have the land back again."

Innumerable cases are found in the books holding grants and bequests to the widows and orphans of fraternal and other voluntary associations valid as a public charity. No cases are found to the contrary. The inherent vice, the almost piteous weakness of the decision made, will appear by a comparison of the case at bar with decisions made in other cases upholding grants and devises as public charities in which the beneficiaries of the trust stood in no different legal relation to the state from the beneficiaries in this case.

In the great Girard will case, (*Vidal et al. v. Girard Executors*, 43 U. S. 127, 11 L. Ed. 205,) Stephen Girard left in trust with the mayor, aldermen and citizens of Philadelphia, without power of alienation, two million dollars of property to found a college for the education of poor, male orphans between the ages of six and ten years, to be selected, first, from the city of Philadelphia; second, from the state of Pennsylvania; third, from the city of New York; fourth, from the city of New Orleans. No public charity has ever been more vigorously and persistently attacked. In that case it was not intimated by the very eminent counsel representing the heirs that the great charity should fail because the state by taxation could not endow and maintain a college for orphan boys of a particular age of the city of Philadelphia and cities foreign to the state. The charity was upheld.

In *Burd Orphan Asylum v. School District*, 90 Pa. St.

21, Mrs. Burd founded an asylum for white, female, orphan children of legitimate birth, of not less than four, and not more than eight, years of age, who had been baptized in the Protestant Episcopal church in the city of Philadelphia.   Would it be contended the state of Pennyslvania was under obligation to support such an institution, or could raise revenue by taxation to found it?   Yet, the gift was upheld as a public charity.

In *Chambers v. City of St. Louis*, 29 Mo. 543, the will of one Bryan Mullanphy read :

"One equal undivided third of all my property, real, personal, and mixed, I leave to the city of St. Louis, in the state of Missouri, in trust, to be and constitute a fund to furnish relief to all poor emigrants and travelers coming to St. Louis on their way *bona fide* to settle in the West."

In a contest between the heirs of the testator and the executors of the will, to set aside this bequest to charity as void, the bequest was established as a valid public charity.   Can it be possible that any intellect may be found so obtuse as even to suggest that the city of St. Louis, or the state of Missouri, could found or promote by taxation a public charity the benefits of which are expressly devoted to persons who are neither citizens nor residents of the city or state ?   Clearly not.   The same may be said of almost all the great public charities of the world founded by private persons from private means.

There is not a house of worship in this state which has not been founded by public charity.   The title to all church property in this state rests in trustees for the benefit of the members of the church.   Not a dollar has been, or can be, raised by the state for their support ; not a church can be founded or endowed by

the state by the use of public revenues ; yet, there is not a church in the state that is not a public charity.

Certain cases are cited in the opinion which, it is contended, support the view taken by the majority. An examination of these cases will show that they have no application whatever to the present controversy.

Within the limits of the city of Philadelphia there exist over 600 large public charities. The legislature of Pennsylvania, in 1874, exempted from taxation "all hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity, . . . found, endowed and maintained by public or private charity." The ninth article of. the constitution of Pennsylvania declares that all taxes shall be uniform upon the same class of subjects, but that the legislature may, by general laws, exempt *"institutions of purely public charity*," and that all laws exempting other than the property enumerated therein shall be void.

One of the first cases which arose over an attempt to levy and collect taxes from the great public charities of that state was *Burd Orphan Asylum v. School District*, supra. It was admitted in that case, as in all of the cases which have arisen in the state of Pennsylvania upon that subject, that the institution sought to be taxed was a valid *public charity*, but the contention made was that, under the constitutional provision, no property could be exempted from taxation unless, in its nature, a *purely* public charity. One quotation from an opinion which did not prevail in that case is made in the majority opinion. In the the prevailing opinion by Mr. Justice Green it was said :

"It is conceded that the devise in question has

created a charity which is public in the strict sense of that expression. But it is urged that it is not *purely* public, and hence that to apply the language of the act to this particular case would be a violation of the constitutional provision. Now, it must be conceded and it has been decided, here and elsewhere, that the word 'purely' is not to have its largest and broadest significance when used in this connection. In the opposing line of thought it is admitted that the word is to have a limited meaning. It is not contended that a charity to be purely public must be open to the whole public, nor to any considerable portion of the public. Without doubt an asylum for the support of fifty blind men or an equal number of paupers would not be obnoxious to the objection that it was not 'purely public.' A charity for the maintenance of disabled seamen, or of aged and infirm stone-masons, resident in the city of Philadelphia, would undoubtedly be a purely public charity. And so also would a charity for the education and maintenance of the children of such persons. And if such a charity should be limited to the white, female, orphan children of such persons between the ages of four and eight years, such limitations, though they would very greatly restrict the class and the number of beneficiaries, would constitute no valid objection to the purely public character of the charity. But seamen and stone-masons are only designated classes of persons, distinguished by their occupation. A charity for the support of poor widows, or indigent old men, or the insane poor of a city, county, borough or township, would be equally a purely public charity, no matter how small would be the number of the beneficiaries or how limited the class.

"Why, then, would not a charity for the support of Episcopalians, Catholics, Jews or Presbyterians of a state or city, be purely public? . . . The objects of such a charity are certain and definite, and the persons benefited are indefinite within the specified class. The circumstance that the beneficiaries are to be of a particular religious faith is only of importance as designating the class. It indicates a certain portion of

the whole community who are to be recipients of the charity. It has the same effect in this respect as the words seamen, stone-masons, blind persons, poor widows, etc., in the cases already mentioned. For the purpose of defining the class of persons who, as distinguished from all other persons in the community, are to enjoy the benefit of the donor's bounty, the legal effect is the same, whether the words used be seamen, Episcopalians, blind persons, Catholics, poor widows, Jews, stone-masons or Presbyterians. The argument that to sustain, as purely public, a charity in favor of persons of a particular religious faith, would be to maintain sectarianism, is of no weight. It is not discrimination in favor of a sect, for it is treating all sects alike. It is not even extending a preference to sectarians ; it is merely recognizing them as a class of persons. We see no reason why that community which ranges persons in classes, so far as this subject is concerned, may not be a community of religious faith, as well as of occupation, condition in life, sex, color, age, disability, physical or mental, or nationality. As to the meaning of the word 'purely,' when used in this connection, we concur in the construction which was given by the supreme court of Ohio in the case of *Gerke v. Purcell*, 25 Ohio St. Rep. 229, that, 'when the charity is public, the exclusion of all idea of private gain or profit is equivalent in effect to the force of "purely" as applied to public charity in the constitution.'"

The case of *Phila., Appellant, v. Masonic Home*, 160 Pa. St. 572, 28 Atl. 954, 23 L. R. A. 545, 40 Am. St. Rep. 736, arose over a construction of the same constitutional provision in regard to taxation. It was conceded that the Masonic home was a public charity. The only question considered was whether the legislature could exempt it from taxation, under a true construction of the constitutional provision. By a divided court, the Masonic home was held not exempt from taxation. However, the Masonic home was, and

continues to be, a valid public charity. The right of the state to assess taxes against it in the collection of revenue alone is determined. No principle of the validity or invalidity of the grant to the home as a public charity was involved.

The grant in the case at bar possesses every element of a valid public charity. Mr. Lewin, in his work on Trusts, defines and distinguishes between private and public trusts or charities as follows :

"In *private* trusts the beneficial interest is vested absolutely in one or more individuals who are, or within a certain time may be, definitely ascertained, and to whom; therefore, collectively, unless under some legal disability, it is, or within the allowed limit will be, competent to control, modify, or determine the trust. The duration of trusts of this kind cannot be extended by the will of the settlor beyond the bounds of legal limitations, viz., a life or lives in being, with an engraftment of twenty-one years. A *public* or *charitable* trust, on the other hand, has for its objects the members of an uncertain and fluctuating body, and the trust itself is of a permanent and indefinite character, and is not confined within the limits prescribed to a settlement upon a private trust." (Vol. 1, p. 98, Text-book Series.)

The definition of, and distinction between, private and public trusts or charities here made are accepted by text-writers and courts the world over as correct. In the case at bar the property was conveyed to trustees for the use of a class of beneficiaries indefinite and undetermined. There is no element of private gain in the grant. This makes it a valid public charity.

The majority opinion concedes the beneficiaries named in the grant to be the proper subjects of charity ; it concedes education to be a proper charitable purpose ; concedes the beneficiaries to be indefinite ; con-

cedes the motives of the grantor to be charitable. But it is argued that, because of the limitation of the beneficiaries to the orphan children of deceased Odd Fellows of the state, the grant is in its nature a private, and not a public, charity, and that the proper law officer of the state cannot interfere to protect the rights of the beneficiaries in the property. This reasoning is both illogical and unsound. There is no such thing in law as a private charity. There are private trusts, and there are public trusts, but private trusts are not charities; public trusts are charities. If the trust here created were a private trust, the beneficiaries, in their own names and their own right, could come into court and claim the property; but, being a public trust or charity, that is, a grant to trustees for the benefit of an indefinite number of orphans, proper subjects of charity, and for the education and maintenance of these orphans, a purely charitable purpose, the orphans, because they are unknown and indefinite, cannot come into court, in their own names and their own right, to enforce their interest in the property, or to correct an abuse or misuse of the property by the trustees. But their rights in the property will be protected by the proper law officers of the state, for the very reason that they are unknown and indefinite in number and will remain so until selection made by the trustees. Upon this proposition all the authorities agree. Mr. Perry, in his work on Trusts, section 732, says:

"Thus a gift to trustees to educate six orphan boys, to be selected and put to school by them, is uncertain, as the boys are uncertain until they are selected. To say that such a trust should not be executed, but that the heir should take the fund, because there is no orphan boy in the world that can come into court and claim the bequest, would be to subvert the foundation

of all public charity.  In all such cases, the heir or
other person interested may bring his bill to test the
legality of the charity, or the trustees may bring their
bill for instruction, or the attorney-general may bring
a bill or information to establish the trust; and the
courts, on such bills, can pass upon the validity of the
bequest as a charitable use.  If, after the charity is
established and is in process of administration, there
is any abuse of the trust or misemployment of the
funds, and there are no individuals having the right
to come into court and maintain a bill, the attorney-
general, representing the sovereign power and the
general public, may bring the subject before the court
by bill or information, and obtain perfect redress for
all abuses.'' (See, also, *Burrill v. Boardman*, 43 N.
Y. 254, 3 Am. Rep. 694; *Att'y-gen. v. Garrison*, 101
Mass. 223; *Parker v. May*, 5 Cush. 341.)

In *People v. Coggswell*, 113 Cal. 129, 45 Pac. 270, 35
L. R. A. 269, it was held:

''It is not only the right but also the duty of the
attorney-general to institute an action in the name of
the state to enforce public charities or trusts, or to
remedy abuses in their management.''

In the opinion it was said:

''The state, as *parens patriæ*, superintends the
management of all public charities or trusts, and, in
these matters, acts through her attorney-general.
Generally speaking, such an action will not be enter-
tained at all unless the attorney-general is a party to
it.  Such was the rule at common law, and it has not
been changed in this state.  Even in those states,
such as Massachusetts, where, by special statute, the
attorney-general is instructed to prosecute such ac-
tions, it is declared that the statute does not narrow
or diminish in this regard the common-law powers in-
cident to the office.  (*Parker v. May*, 5 Cush. 336.)
The principle and rule are thus succinctly stated in
*Attorney-general v. Compton*, 1 Younge & C. Ch. 417:
Where property affected by a trust for public purposes
is in the hands of those who hold it devoted to that

trust, it is the privilege of the public that the crown should be entitled to intervene by its officers for the purpose of asserting, on behalf of the public generally, the public interest and the public right, which, probably, no individual could be found effectually to assert, even if the interest were such as to allow it. (2 Kent's Commentaries, 10th ed. 359; Lewin on Trusts, §665; 1 Daniel's Chancery Practice, §13; Perry on Trusts, §732.)''

I submit the deed is good, the decision bad. Nor is this all. Section 559 of the code provides:

''In cases decided by the supreme court, when the facts are agreed to by the parties, or found by the court below or a referee, and when it does not appear by exception or otherwise that such findings are against the evidence in the case, the supreme court shall send a mandate to the court below directing it to render such judgment in the premises as it should have rendered on the facts agreed to or found in the case.''

In the court below judgment was entered in favor of the defendants. The case was tried by the court without the intervention of a jury. No special findings were made or requested. The case was not tried upon an agreed statement of facts. The trial court found there was no fraud practiced in the making of the deed in question. Yet, this court cuts off all further defense which may be made by the trustees and directs judgment in favor of plaintiff. From what source does this court derive the power so to order? It is neither authorized by law nor sanctioned by precedent. Why the haste? It might be developed upon another trial that plaintiffs have no standing in court to urge the invalidity of the conveyance attacked. They must first prove their right to the property before the trustees are called upon to de-

fend.   In the case of *Stout v. Coates, Assignee,* 35 Kan. 382, 11 Pac. 151, Chief Justice Horton said :

"As the facts in these cases have not been agreed to by the parties, and as certain findings of fact of the trial court are against the evidence, we cannot direct judgment to be entered in the premises."

After a thorough examination of many of the multitude of decisions and precedents governing this case, it is to my mind incomprehensible and inexplicable why this most noble gift to a worthy charity has been stricken down in the house of its friends.   The reasons given for so doing neither convince the mind nor excuse the act.   We had a wealth of learning to guide our footsteps.   The mistake made is irretrievable. Men of large wealth and benevolent minds will in future shun the state as they would a pestilence.   No court, unless compelled thereto by law, will follow the decision made.   No lawyer will cite it unless in support of a doubtful or desperate case.   Its end accomplished, it should retire to the oblivion to which it belongs.   The orphans in their poverty and their rags will say of it, "Anathema Maran-atha."

BURCH, J. (dissenting) :  I approve the views of the law relating to gifts for charitable purposes as announced in the foregoing dissenting opinions.